COURT OF APPEALS OF VIRGINIA


Present:   Judge Clements, Senior Judges Willis and Annunziata
Argued at Alexandria, Virginia


SALVADORE M. CORADO, S/K/A
  SALVADOR MAURICIO CORADO
                                                            OPINION BY
v.      Record No. 1982-04-4               JUDGE ROSEMARIE ANNUNZIATA
                                                         DECEMBER 28, 2005
COMMONWEALTH OF VIRGINIA


                    FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                              Joanne F. Alper, Judge

              Mark S. Thrash for appellant.

              Stephen R. McCullough, Assistant Attorney General (Judith
              Williams Jadgmann, Attorney General, on brief), for appellee.


        Salvadore Corado appeals his convictions for lynching, criminal street gang participation,

and being a member of a mob that maliciously caused bodily injury by means of a caustic

substance.[1]  He contends that the trial court erred:  (1) by admitting transcripts of grand jury

testimony provided by his codefendants; (2) by instructing the jury on the charge of lynching; (3)

by admitting the testimony of expert witnesses on gang culture and gang interaction; and (4) by

admitting the prior convictions of two codefendants to prove that Corado was a member of a

criminal street gang.  He also contends that the evidence was insufficient to prove that a caustic

substance was used.  For the foregoing reasons, we affirm his convictions.


_____
        [1] He makes no argument that his conviction for brandishing a firearm should be
overturned.

I.  Background

We view the evidence and all reasonable inferences flowing from the evidence in a light most favorable to the Commonwealth as the party prevailing below.  Garcia v. Commonwealth, 40 Va. App. 184, 189, 578 S.E.2d 97, 99 (2003).  So viewed, the evidence establishes that a fight between the South Side Locos gang (SSL) and the Mara Salvatrucha gang (MS-13) broke out during a "sweet fifteen" party at an EconoLodge Hotel in Arlington, Virginia in 2003.  The evidence further proved that Corado, Eber "Lalo" Rodriguez, Anthony Paz-Ortiz, Simon Flores-Siliezar, and Victor Menjivar were members of the SSL gang and that they went uninvited and armed to the hotel anticipating a fight with MS-13 members who were already present.  During the fight that ensued, Rodriguez stabbed and killed Cesar Rios Garcia, Flores-Siliezar sprayed pepper spray into the crowd as SSL members left the hotel, and Corado brandished and pointed a BB gun to ward off attacking MS-13 members.

II.  Admission of Grand Jury Transcripts

Corado contends that the trial court erred in admitting transcripts of the grand jury testimony of codefendants Anthony Paz-Ortiz and Victor Menjivar.  Corado confines his claim of reversible error to the charge of lynching under Code § 18.2-39.  We limit our analysis accordingly.

To sustain a conviction under the lynching statute, the Commonwealth was required to prove Corado's membership in a mob, defined by Code § 18.2-38 as:

> Any collection of people, assembled for the purpose and with the intention of committing an assault or a battery upon any person or an act of violence as defined in § 19.2-297.1, without authority of law, shall be deemed a "mob."

The Commonwealth sought to establish Corado's membership in a mob by proving that SSL was a "collection of people, assembled for the purpose and with the intention of committing an

assault and battery on any person . . ." and that Corado was a member of and a leader in the SSL gang.

Corado's argument centers on the following portions of the grand jury transcripts: (1) the admission by Paz-Ortiz and Menjivar that they were members of the SSL gang, and (2) their admission they anticipated a fight with MS-13 before they went to the EconoLodge. The former admissions tended to establish the existence of a "collection of people"; the latter tended to prove the intent with which the "collection of people" was formed. With respect to the group's collective intent, Paz-Ortiz responded in the affirmative to the question, "[Y]ou went there expecting that there was going to be a fight?" He stated, "Oh, yes. For me, yes. I was afraid to go because they were there." He further agreed that, were MS-13 and SSL to meet, "there's probably going to be a fight." Menjivar's grand jury testimony established that he had received a phone call informing him that MS-13 members were at the EconoLodge. He acknowledged that "[I]t was very possible there would be a fight," when the SSL went to the EconoLodge, and he conceded knowing that an MS-13 member named "Diablo" would be there; he stated that Diablo, one of his main rivals, "hated me and wanted to kill me."

Corado's argument is rooted in his Sixth Amendment right to confrontation, which he contends was violated because neither Paz-Ortiz nor Menjivar was available at his trial and because he did not have an opportunity to cross-examine them. Corado relies on the Supreme Court's recent decision in Crawford v. Washington, 541 U.S. 36 (2004), to support his contention that the Sixth Amendment bars the admission of such "testimonial hearsay."

The Commonwealth concedes that their grand jury testimony falls within Crawford's definition of testimonial hearsay and should have been excluded from evidence, but contends the error was harmless beyond a reasonable doubt. The Commonwealth also argues that the issue is

procedurally defaulted because Corado failed to preserve his objection in the trial court for appeal.

We assume, without deciding, that the Sixth Amendment issue was preserved, and hold that the admission of the grand jury transcripts was harmless error beyond a reasonable doubt. We begin our analysis by reiterating the heightened standard under which we review constitutional error for harmlessness.

> "When a trial court admits evidence in violation of the United States Constitution, the court's error is a constitutional one." Williams v. Commonwealth, 30 Va. App. 378, 383, 517 S.E.2d 246, 249 (1999) (citing Jenkins v. Commonwealth, 254 Va. 333, 336, 492 S.E.2d 131, 132 (1997)). "Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Id. (internal quotations and citations omitted). "We decide whether the erroneous admission of evidence was sufficiently prejudicial to require reversal on the basis of our own reading of the record and on what seems to us to have been the probable impact on the fact finder." Id. at 384, 517 S.E.2d at 249 (internal quotations and citations omitted).

Green v. Commonwealth, 32 Va. App. 438, 446, 528 S.E.2d 187, 191 (2000). "An error is harmless only when it plainly appears from the record and the evidence that the error has not affected the verdict. Whether an error does not affect the verdict must be determined 'without usurping the jury's fact finding function.'" Hooker v. Commonwealth, 14 Va. App. 454, 457, 418 S.E.2d 343, 345 (1992) (citations omitted).

First, our review of the record indicates that Corado's membership in "a collection of people," known as the SSL gang was never seriously contested. Numerous pieces of evidence connected Corado, Paz-Ortiz, Menjivar, Rodriguez, Majano, and Flores-Siliezar with one another and with their participation in SSL. A search of Corado's residence yielded evidence that Corado had written "SSL" in black magic marker on a brick wall. A wooden plaque inscribed with the words "SSL" was found on the premises. A search of Corado's computer

revealed an SSL website.  The Commonwealth introduced a photo of Rodriguez, Menjivar, and Corado forming the initials SSL with their hands.  Detective Rodriguez testified Paz-Ortiz was a member of SSL and he had seen Paz-Ortiz associating with Corado, Majano, and Menjivar.  Detective Rodriguez also identified Rodriguez, Majano, and Menjivar as gang members, and similarly testified that they were SSL members who associated with Corado and Paz-Ortiz.

Second, the evidence was overwhelming and, with the exception of Corado's testimony, unrebutted that the SSL gang came to the EconoLodge anticipating a fight with MS-13 gang members.  Marisela Mijango, a former member of the SSL who once dated Corado and who knew many of the SSL gang members, had informed SSL members of the MS-13 presence there.  She testified that she telephoned Eber Rodriguez and described the threatening encounter she had had with MS-13 members.  She specifically informed him that six or seven men, wearing the MS-13 colors and bandanas covering their faces, arrived at the EconoLodge, "cursing," and saying, "Where the fuck is Southside at?"  "Where the fuck them niggas at?"  So informed, the SSL members came to the hotel together, asking if the "niggas [MS-13 gang members]" were still there.  Thomas Bolanos, one of the Commonwealth's witnesses present at the party, heard an SSL member say, "They were getting ready to see what's up," which he understood to mean, "to go see if the other group wanted to fight."  As the SSL members proceeded upstairs at the hotel, Bolanos and Romero, another witness who was present, heard them shouting "Fuck MS," signaling their awareness of the presence of MS-13 members and underscoring the hostility between the two gangs.  The SSL gang was also heard shouting, "South Side Locos."  The witnesses' testimony, in the aggregate, viewed together with evidence that SSL members came armed with pepper spray, a knife, a baseball bat, and a BB gun, leads to the inescapable conclusion that SSL came to the EconoLodge with the intent to fight with MS-13 members.

Third, and finally, Corado himself admitted on cross-examination that he was a member of SSL, that he was at the EconoLodge on the night of the murder, having arrived with the other SSL members, and that he went upstairs anticipating a fight with MS-13 members. He then participated in the brawl that ensued and brandished a BB gun to fend off MS-13 members.

We conclude that, even in the absence of Menjivar's and Paz-Ortiz's grand jury testimony, the jury would have convicted Corado of lynching as defined by Code §§ 18.2-38 and 18.2-39. See also *infra* Part II. Corado was, beyond any reasonable doubt, a member of a mob that had formed the collective intent to commit an assault and battery upon MS-13 members, and the evidence established that a member of that mob killed Cesar Rios Garcia. Viewed in the context of the overwhelming and unrebutted evidence establishing the elements of the crime, we conclude that the impact of grand jury testimony on the jury was inconsequential. We therefore hold that the trial court's admission of the grand jury transcripts into evidence constituted harmless error beyond a reasonable doubt.

### III. Instruction 8

Corado contends that the trial court improperly instructed the jury on the charge of lynching. Instruction 8 informed the jury that

> [t]he Commonwealth must prove beyond a reasonable doubt each of the following elements . . . :
>
> (1) That the defendant was a member of a mob; and
>
> (2) That a member or members of that mob committed an act of violence upon the body of Cesar Rios Garcia; and
>
> (3) That the act of violence resulted in the death of Cesar Rios Garcia.

Corado's point of error is dependant upon the construction he places on the statutes defining the elements of the crime. He argues that the statutes require the Commonwealth prove

- 6 -

that the ultimate victim of the mob violence was the mob's initial or specific, intended target. The plain language of the statute does not support the construction Corado urges.

When reviewing a challenge to jury instructions, it is our duty "'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" Darnell v. Commonwealth, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (quoting Swisher v. Swisher, 223 Va. 499, 503, 290 S.E.2d 856, 858 (1982)). Code § 18.2-39 defines lynching as "[a]ny act of violence by a mob upon the body of *any* person, which shall result in the death of such person." (Emphasis added). In turn, Code § 18.2-38 defines mob as "[a]ny collection of people, assembled for the purpose and with the intention of committing an assault or a battery upon *any* person or an act of violence as defined in § 19.2-297.1, without authority of law." (Emphasis added).

The statute could not be more clearly stated. Code § 18.2-38 states that a mob can come into being if the individual members assemble with the intent of committing violence upon *any* person. Code § 18.2-39 further states that, once a mob has assembled, an act of violence by that mob resulting in the death of *any* person constitutes lynching. The term "any person" means just that. It is not qualified in any way and, quite literally, covers "any person." See Coles v. Commonwealth, 44 Va. App. 549, 557-58, 605 S.E.2d 784, 788 (2005) (noting that we assume the legislature chose with care the words used and that we further assume the words are used in their ordinary sense). Cesar Rios Garcia, as a person, comes within the meaning of the term, irrespective of whether he was the initial, specific target of the mob.

Our decision in Harrell v. Commonwealth, 11 Va. App. 1, 396 S.E.2d 680 (1990), on which Corado relies, does not support a different conclusion. In that case, we considered the defendant Harrell's challenge to his conviction for malicious assault and battery while acting as a member of a mob. Harrell was one of a boisterous group of about twenty persons loitering in a

suburban street after a party had ended.  Id. at 4-5, 396 S.E.2d at 681.  When a resident of the suburban community, Pattenaude, came out of his house and asked the group to disperse, the group initially appeared "receptive" to his request.  Id. at 5, 396 S.E.2d at 681.  However, an unidentified individual from the group began to destroy Pattenaude's mail box and, as Pattenaude crossed the street to return to his residence, Harrell struck him with a club and ruptured his spleen.  Id.  On these facts, we reversed Harrell's conviction for assault and battery while acting as a member of a mob because we concluded that the Commonwealth did not prove the group had formed a collective intent to commit an assault and battery.  Id. at 6, 396 S.E.2d at 682.  Rather, the evidence only proved that Harrell and another unidentified person acted as "individuals involved in a fray," not as members of "a mob assembled for a criminal purpose." Id. at 11, 396 S.E.2d at 685.  In reaching this conclusion, we noted that "[t]he criterion which distinguishes individual behavior while part of a group from 'mob' behavior is assembling for the specific purpose and with the specific intent of committing an assault and battery upon any person."  Id. at 7, 396 S.E.2d at 683.  Because the evidence in Harrell failed to show that the other members of the group had formed the collective intent to commit an assault and battery, showing at most that the defendant acted as an individual, the defendant's conviction was reversed.  Id. at 12, 396 S.E.2d at 685.  Our decision in Harrell did not turn on whether the evidence was sufficient to prove that the group formed a collective, specific intent to injure Pattenaude and only Pattenaude.  Corado's reliance on Harrell is therefore misplaced.

In this case, Instruction 8 was properly given because it accurately reflects the law cited above.  To sustain a conviction under the statute's mandate, the jury was required to find Corado was a member of a mob, and a member or members of that mob killed Cesar Rios Garcia. Instruction 9 further informed the jury that a mob "is any collection of people assembled for the purpose and with the intention of committing an assault or battery or an act of violence upon any

- 8 -

person." Rios Garcia qualifies as "any person" within the meaning of the lynching statute. Because the instruction clearly and accurately stated the law, we hold that the trial court did not err in submitting Instruction 8 to the jury.

## IV. Expert Testimony

Corado contends that the trial court abused its discretion by allowing expert testimony that was based on facts not in evidence and was speculative. He further contends the testimony was improper because it pertained to matters as to which the jury was competent to form its own opinion.

The Commonwealth qualified Detectives Rodriguez and Ignacio as experts on gangs and gang culture. Detective Rodriguez testified without objection about gangs in northern Virginia generally, on how the SSL and MS-13 gangs were "getting along," and Corado's apparent leadership role in SSL. Detective Ignacio described the meaning of gang graffiti from a photograph.

After testifying generally about gang names, colors, hand signs, and motivations, Detective Rodriguez, over objection, gave an expert opinion on tensions between MS-13 and SSL, and on Corado's leadership role with SSL. The trial judge ruled the testimony was admissible "as long as the testimony is based upon information of the type reasonably relied upon by experts in the field."

We agree with Corado's claim that the trial court applied an incorrect standard for the admissibility of Detective Rodriguez's expert testimony. The ruling was contrary to Virginia law, which retains the common law prohibition that expert opinion testimony in criminal cases may not be based on facts not in evidence. Simpson v. Commonwealth, 227 Va. 557, 565-66, 318 S.E.2d 386, 391 (1984); see also Ortiz v. Barrett, 222 Va. 118, 130, 278 S.E.2d 833, 839 (1981).

In its argument before the trial court, the Commonwealth relied on <u>Funderburk v. Commonwealth</u>, 6 Va. App. 334, 368 S.E.2d 290 (1988), and <u>Kern v. Commonwealth</u>, 2 Va. App. 84, 341 S.E.2d 397 (1986), to support its position that the opinion testimony was properly admitted.  In <u>Funderburk</u>, we upheld the admission of an expert's opinion that identified the victim's blood type even though the opinion was based in part on studies and statistical tables that were not admitted into evidence.  <u>Funderburk</u>, 6 Va. App. at 338, 368 S.E.2d at 292.  In <u>Kern</u>, we affirmed the trial court's ruling allowing an appraisal of a gemstone from a market brochure that was not introduced into evidence.  <u>Kern</u>, 2 Va. App. at 87-88, 341 S.E.2d at 399.

The Commonwealth contends that the decisions in <u>Funderburk</u> and <u>Kern</u> created a broad exception to <u>Simpson</u> and that the exception permits expert testimony based on facts not in evidence with two provisos:  that the proponent of the evidence show that 1) other experts in the field reasonably rely upon the same type of evidence, and 2) the evidence was not prepared for litigation.

The Commonwealth's reliance on <u>Funderburk</u> and <u>Kern</u> is misplaced.  The interpretation of the holdings it urges directly contradicts the Virginia Supreme Court's decision in <u>Simpson</u> and was categorically rejected by the Court:

> The Commonwealth, however, urges us to adopt, in substance, the view of the Federal Rules of Evidence, which would permit an expert to base his opinion on facts made known or perceived by him at or before trial, whether admissible in themselves or not, provided they are facts of a type normally relied on by other experts in the field.  <u>See</u> Fed. R. Evid. 703 and 705.

> We are unwilling to accept this invitation.  The General Assembly, in 1982, enacted Code § 8.01-401.1 which essentially adopts the foregoing provisions of the Federal Rules of Evidence.  That statute's application is expressly limited to "any civil action."  We regard this limitation as a clear expression of legislative intent to retain the historic restrictions upon expert testimony in criminal cases in Virginia.

Simpson, 227 Va. at 566, 318 S.E.2d at 391. This Court is bound by decisions of the Supreme Court of Virginia, and we are without authority to overrule them. Morris v. Commonwealth, 45 Va. App. 181, 187-88, 609 S.E.2d 92, 95 (2005).

That said, notwithstanding the trial court's articulation of an incorrect legal standard in admitting the challenged expert testimony, a review of the record shows that, after Detective Rodriguez offered an opinion based on facts not in evidence, and subsequent to defense objections having been raised, he was able to render an opinion addressing how the gangs were "getting along" in April 2003 in Arlington and Alexandria, based on personal knowledge. Detective Rodriguez testified he knew from his interviews with gang members that tensions existed between SSL and MS-13 and that Menjivar's change of allegiance from MS-13 to join SSL was one cause of the inter-gang tension. He had witnessed assaults on former gang members because of these defections. He also testified he personally warned Corado that MS-13 knew where Corado lived and that MS-13 intended to harm Menjivar. Prior to the fight at the EconoLodge, Detective Rodriguez interviewed members of SSL, including Corado, shortly after an altercation with MS-13. As a result of his direct interaction with SSL and MS-13 members, Detective Rodriguez offered his opinion based on these facts. We therefore conclude that Detective Rodriquez's expert opinion was substantially based on facts in evidence and was not erroneously admitted. See Simpson, 227 Va. at 566, 318 S.E.2d at 391-92.[2]

Similarly, Detective Rodriguez's opinion that Corado was the SSL leader was based on a dozen meetings he had with Corado, his frequent witnessing of SSL meetings at Corado's home,

---

[2] In Simpson, the Virginia Supreme Court rejected the defendant's contention that the trial court erred in denying his motion to strike an expert opinion because the expert had partially relied on evidentiary facts that had not been admitted. Affirming the conviction, the Supreme Court held, "Our examination of the record, . . . reveals a sufficient factual basis for the admission of [the expert's] opinion without reference to the [evidence not admitted]." 227 Va. at 566, 318 S.E.2d at 391-92. We apply the same analysis here.

and his personal observations regarding "how [Corado] conducted himself, [and] the way other individuals surrounded themselves around him." The facts underlying his opinion were the subject of his testimony and were thus in evidence. Because Detective Rodriguez's opinion was substantially based on facts in evidence, we find the trial court did not err in admitting it.

Corado further contends that the trial court improperly admitted Detective Ignacio's testimony regarding the significance of gang graffiti. We conclude that he failed to properly preserve this objection at trial. Rule 5A:18 states that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling." The objection must be made with specificity, and the grounds argued in support of the objection in the trial court must be the same grounds argued on appeal. See Courembis v. Courembis, 43 Va. App. 18, 27, 595 S.E.2d 505, 509 (2004). The purpose of this rule is to afford opposing counsel a meaningful opportunity to respond to the objection, to give the trial court an opportunity to rule intelligently on the issue, and to prevent unnecessary appeals. West v. Commonwealth, 43 Va. App. 327, 337, 597 S.E.2d 274, 278 (2004).

Corado argued that expert testimony on gang graffiti was inadmissible prior to Detective Rodriguez's testimony. However, his only objection to Detective Ignacio's testimony addressing a photograph of gang graffiti was that the evidence was cumulative. He thus failed to preserve the issue on appeal as required under Rule 5A:18.

Corado next contends that the trial court erred in allowing Detective Rodriguez's opinion regarding Corado's leadership role in SSL. He argues that whether Corado was a leader in the gang was a matter of common knowledge about which a jury was competent to form its own opinion, citing Coppola v. Commonwealth, 220 Va. 243, 252, 257 S.E.2d 797, 803-04 (1979) ("[w]here the facts and circumstances shown in evidence are such that men of ordinary intelligence are capable of comprehending them, forming an intelligent opinion about them, and

drawing their own conclusions therefrom, the opinion of an expert based upon such facts and circumstances is inadmissible"). Based on this Court's decision in Utz v. Commonwealth, 28 Va. App. 411, 426, 505 S.E.2d 380, 387 (1998) (holding gangs and gang culture subjects for expert testimony), we hold Corado's argument is without merit.

Finally, we reject Corado's challenge to Detective Ignacio's testimony that Corado held a leadership position in the SSL gang. The record fails to show that Detective Ignacio testified to Corado's role in the SSL hierarchy.

### V. Prior Convictions

Corado contends the trial court erred in admitting evidence of the prior convictions of Eber Rodriguez and Simon Flores-Siliezar. We disagree.

Based on Corado's participation in the melee at the hotel, he was charged with criminal street gang participation in violation of Code § 18.2-46.2. In order to prove that Corado participated in a "criminal street gang," the Commonwealth was required to show that members of the gang "individually or collectively engage in or have engaged in a pattern of criminal gang activity." Code § 18.2-46.1.[3] The Code defines "criminal gang activity" as the

> commission of, attempt to commit, conspiracy to commit or solicitation of two or more predicate criminal acts, at least one of which is an act of violence, provided such predicate criminal acts (i) were not part of a common act, transaction or scheme or (ii) were committed by two or more persons who are members of, or belong to, the same criminal street gang.

Id. To establish the requisite pattern of criminal gang activity, the trial court admitted a copy of Rodriquez's prior conviction for assault and battery. It additionally admitted a copy of Flores-Siliezar's two destruction of property convictions for acts committed on two separate

---

[3] Code § 18.2-46.1 was amended in 2004. Because the fight at the hotel occurred in 2003, the 2004 amendments to the statute do not apply.

- 13 -

occasions.  Corado argues that the convictions were improperly admitted based on a statutory construction he urges this Court to adopt.  We decline to do so.

Corado argues that, under Code § 18.2-46.1, the Commonwealth must prove the predicate criminal acts were committed by "two or more persons" who are members of the same gang.  He reasons that the Commonwealth's evidence showed that Flores-Siliezar and Rodriguez acted individually, not collectively, and that his conviction must be reversed on that ground.[4]  The argument is without merit.

First, Corado ignores the plain language of the statute that permits proof of individually committed acts to establish a pattern of criminal gang activity.  Second, Corado misapprehends the meaning of the statute's definition of "criminal gang activity."  The language of the statute states in the disjunctive that two or more predicate criminal acts establish a pattern of criminal gang activity "*provided*" that such acts "(i) were not part of a common act, transaction or scheme *or* (ii) were committed by two or more persons who are members of, or belong to, the same criminal street gang."  Code § 18.2-46.1 (emphasis added).  Corado's argument ignores the statute's use of the disjunctive connector "or" which provides alternative methods of proving the required elements.  Under that disjunctive formulation, the statutory requirements are met when the Commonwealth proves two or more predicate criminal acts that were not part of a common act, transaction, or scheme, even if committed individually.  Corado does not contend, and the evidence does not reveal, that the predicate criminal acts underlying the convictions offered by the Commonwealth were part of a common act, transaction, or scheme.  It follows that the Commonwealth was not required to prove the alternate statutory basis for establishing a pattern

---

[4] Corado's additional argument was withdrawn from consideration upon his concession the argument was procedurally defaulted.  We, therefore, do not address his contention that the statute requires the persons who commit the predicate criminal acts be members of the gang at the time the acts were committed and that the Commonwealth failed to prove that predicate fact with respect to Rodriguez.

of criminal gang activity in this case, *viz.*, that the predicate criminal acts were committed collectively by two or more persons of the same gang. The convictions offered by the Commonwealth showed that two members of the gang engaged in the predicate criminal acts individually and that the acts were not part of a common act, transaction, or scheme. The evidence thus established a pattern of criminal gang activity as defined by Code § 18.2-46.1. The trial court did not err in admitting them.

## VI. Caustic Substance

Corado contends the trial court erred in failing to grant his motion to strike the Commonwealth's charge that he was part of a mob that maliciously caused bodily injury by means of a caustic substance. He argues that (1) that oleoresin capsicum (pepper spray) is not a "caustic substance or agent" within the meaning of Code § 18.2-52, and (2) the Commonwealth failed to prove the pepper spray was a caustic substance beyond a reasonable doubt.

Code § 18.2-52 provides, in relevant part, that "[i]f any person maliciously causes any other person bodily injury by means of any acid, lye or other caustic substance or agent or use of any explosive or fire, he shall be guilty of a felony." Whether pepper spray falls within Code § 18.2-52's definition of "caustic substance or agent" is a question of statutory interpretation we review *de novo* on appeal. Shreve v. Commonwealth, 44 Va. App. 541, 545, 605 S.E.2d 780, 781-82 (2004).

> [U]nder basic rules of statutory construction, we determine the General Assembly's intent from the words contained in the statute. When the language of a statute is unambiguous, courts are bound by the plain meaning of that language and may not assign a construction that amounts to holding that the General Assembly did not mean what it actually has stated.

Alger v. Commonwealth, 267 Va. 255, 259, 590 S.E.2d 563, 565 (2004).

This Court in Floyd v. Commonwealth, 31 Va. App. 193, 522 S.E.2d 382 (1999), considered the meaning of "caustic substance" under this statute. Id. at 199-200, 522 S.E.2d at

- 15 -

385. In Floyd, although the substance was never identified, the victim was apparently sprayed with a form of pepper spray. Id. at 196, 522 S.E.2d at 383. "The substance burned and stung [the victim's] eyes and both sides of her face, and [she] could no longer see." Id. Medical personnel flushed the victim's face and eyes with saline solution for several hours before she experienced relief from the burning and stinging sensations. Id. at 199, 522 S.E.2d at 385.

Floyd argued that the evidence failed to prove the pepper spray was a caustic substance. We disagreed and held, although "the substance was not recovered, tested or introduced into evidence . . . [n]onetheless, the nature of a substance can be proved by proof of the circumstances and effects of its use." Id.

In Floyd, the symptoms the victim experienced sufficiently proved that the defendant had used a caustic substance or agent to cause a malicious wounding within the meaning of the statute. See id. (substance caused victim's "skin and eyes to burn, temporarily blinded her and required medical personnel to spend several hours rinsing her eyes with saline solution to provide relief").

Applying the holding in Floyd, the trial court found the pepper spray used to injure the victims in this case was a caustic substance. The Commonwealth's expert on pepper spray testified that pepper spray can cause physiological changes, including "a burning sensation, irritation and swelling" on the skin, drying of the eyes which causes them to shut involuntarily, an increase of mucus membrane flow, an intense burning sensation to the eyes, irritation to the lungs when inhaled, and shortness of breath. The victims exhibited these symptoms when Flores-Siliezar sprayed pepper spray into the crowd gathered at the EconoLodge. Elvira, one of the victims, testified that "it burned my throat. My eyes started going watery, and I started itching." The spray aggravated her asthma, to the point that she could neither breathe nor effectively walk. She noticed others around her were coughing as well. Another victim,

Bolanos, testified that he began to cough as a result of the sprayed substance, developed teary eyes, and had difficulty breathing. Another victim, Jaqueline Romero, experienced similar irritations.

Corado contends that, because the term "caustic" is not defined at Code § 18.2-52, it 'should be given its ordinary and usually accepted meaning unless a different intention is fairly manifest,'" quoting Floyd, 31 Va. App. at 199, 522 S.E.2d at 385. He argues that the plain meaning of "caustic" requires a finding of tissue damage, citing Blakiston's Gould Medical Dictionary 238 (4th ed. 1979) (defining caustic as "very irritant, burning; capable of destroying tissue"); Webster's New Twentieth Century Dictionary Unabridged (2d ed. 1955) (defining caustic as 1. burning or corrosive, destructive to living tissue); Merriam Webster's Collegiate Dictionary (11th ed. 2004) (defining caustic as "capable of destroying or eating away by chemical action; corrosive"); Dorland's Illustrated Medical Dictionary (24th ed. 1965) (defining caustic as "1. Burning or corrosive, destructive of living tissue"); The Random House Dictionary of the English Language Unabridged (2d ed. 1987) (defining caustic as "1. Capable of burning, corroding, or destroying living tissue"); Oxford English Dictionary (2d ed. 1989) (defining caustic as "1. Burning, corroding, or destroying living tissue").

We acknowledge that the cited authorities, which include destruction of living tissue in the definition of caustic, may have arguably persuasive applicability in determining the meaning of the term, "caustic" in this case, particularly when read in context with Code § 18.2-52's inclusion of the terms "acid" and "lye" which typically are considered substances that cause tissue damage through chemical action. See Martin v. Commonwealth, 224 Va. 298, 301, 295 S.E.2d 890, 891 (1982) ("Under the rule of *ejusdem generis*, when a particular class of persons or things is enumerated in a statute and general words follow, the general words are to be restricted in their meaning to a sense analogous to the less general, particular words."). We are

however, bound by the decision in <u>Floyd</u>, which neither referred to nor required tissue destruction or deterioration as part of its definition of "caustic substance."

Finally, Corado contends the Commonwealth failed to prove the pepper spray was a caustic substance beyond a reasonable doubt. We disagree.

Here, the symptoms of burning and significant irritation are not unlike those proved in <u>Floyd</u>. Thus, we agree with the trial judge that the Commonwealth's proof was sufficient to show a "caustic" substance within the meaning of the statute and within the meaning of <u>Floyd</u>. Corado's argument that the evidence was not sufficient to establish that the pepper spray was a caustic substance beyond a reasonable doubt therefore must fail. <u>See</u> <u>Kelly v. Commonwealth</u>, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (holding that the appropriate sufficiency of the evidence question is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979))).

## VII. Conclusion

For the foregoing reasons, Corado's convictions are affirmed.

<u>Affirmed.</u>