COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Alston, McCullough and Senior Judge Annunziata
Argued at Alexandria, Virginia


JONATHAN NATHANIEL RAMSEY

OPINION BY
v.       Record No. 2023-12-4        JUDGE ROSEMARIE ANNUNZIATA
MAY 13, 2014

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Jane Marum Roush, Judge

Andrew T. Elders (Elders, Zinicola & Blanch, PLLC, on brief), for
appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Jonathan Nathaniel Ramsey appeals his convictions for burglary, abduction with the intent

to defile, malicious wounding, and sexual penetration with an inanimate object.  Ramsey argues that

the trial court erred (1) in denying his motion *in limine* to exclude the expert opinions of Kathryn

Colombo and Dr. Mark Perlin as being based upon hearsay not in evidence; (2) by excluding as

irrelevant evidence of third-party guilt of E.V.[1]; (3) by quashing his subpoena *duces tecum* and

forcing the return of certain documents related to E.V.; and (4) by denying his motion to declare

E.V. an adverse witness prior to and during direct examination by defense counsel.  We disagree

with Ramsey and affirm his convictions.

---

[1] We use the initials of the individual Ramsey claims was the perpetrator because the
individual is a juvenile.

BACKGROUND

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)).  So viewed, the evidence proved at approximately midnight on August 27, 2011, A.B. was in her kitchen and noticed nothing out of the ordinary.  At approximately 4:00 a.m., A.B. woke up because she heard her five-year-old daughter, V.R., calling, "Mommy, Mommy, Mommy," from downstairs.  A.B. went downstairs and found V.R. naked from the waist down with multiple cuts on her body, leaves in her hair, and her shirt covered in blood.  When A.B. put V.R. to bed earlier that evening, V.R. was not covered in blood and she was dressed in a clean shirt, underwear, and leggings.

The window in A.B.'s kitchen had been forced open, and muddy footprints were found on a bench below the window.  The footprints matched the shoes taken from Ramsey after his arrest.  The authorities determined that palm and fingerprints on the open window were left by Ramsey.  Ramsey admitted he broke into A.B.'s home in order to steal items and asserted that E.V. was with him, but A.B.'s purse and several electronic devices in the kitchen and living area were not stolen.

The authorities found V.R.'s underwear and leggings in a wooded area near her residence, lying on top of a Farberware kitchen knife.  The items were found in a wooded area that was less than a 60-second walk from V.R's front door and a 40-second walk from Ramsey's front door.  The authorities submitted V.R.'s shirt, the underwear, the leggings, and the knife for analysis.  During the execution of a search warrant for Ramsey's residence, the authorities found a blood-stained T-shirt in a trash bag and a pair of men's underwear with blood stains in a separate trash bag, together with other trash Ramsey admitted came from his kitchen.  One of the

bags was found on the back deck of Ramsey's residence; the other bag was found inside a trash can beside the deck. The size and type of the men's underwear were the same as those Ramsey was wearing when he was arrested. The authorities also found a Farberware knife in the sink. The knife had the same handle design as the knife found with V.R.'s clothing.

The blade and handle of the knife tested positive for blood, and V.R. could not be eliminated as a contributor of the DNA profile developed from the blood stains. V.R. could not be eliminated as a contributor of a DNA profile developed from the blood stains found on the front left leg of the men's underwear. Neither V.R. nor Ramsey could be eliminated as a contributor of a mixture profile from the interior waistband of the men's underwear. V.R. could not be eliminated as a contributor of a blood stain found on the T-shirt seized from Ramsey's trash bag at his residence. Ramsey could not be eliminated from a mixture profile from the interior neck of the T-shirt.

At some point after his arrest, Ramsey learned that his friend, E.V., had been convicted of misdemeanor sexual battery of a seven year old. The offense occurred in February 2010 when E.V. was thirteen years old. Ramsey obtained the details of E.V.'s conviction from the Commonwealth through the discovery process. Prior to trial, Ramsey used a subpoena *duces tecum* to obtain E.V.'s probation file from the Fairfax County Probation and Parole office. The Commonwealth moved the court pretrial to declare the subpoena *duces tecum* invalid and order Ramsey to return the documents. The Commonwealth also moved to quash subpoenas for certain mental health professionals providing services to E.V. The trial court granted the Commonwealth's motions.

On the morning of trial, Ramsey moved *in limine* to exclude the testimony of Colombo, a scientist at the Department of Forensic Science, and Dr. Perlin, the chief scientist and executive officer at Cybergenetics, on the ground that their opinions were based upon hearsay not in

evidence.  Ramsey specifically sought to exclude their testimony regarding the statistical comparison of DNA profiles because, in determining the statistical comparison, the scientists relied on allele frequency data and "you can't cross-examine an expert on data that they didn't create or they have no direct knowledge of."  According to the Commonwealth's proffer, the allele frequency data was a database compiled and created by the Virginia Department of Forensics and was the type of database commonly relied upon by forensic laboratories.  The trial court denied Ramsey's motion.

At trial, Colombo testified regarding forensic tests performed on the knife found with the victim's leggings and underwear.  V.R. could not be eliminated as a contributor of the DNA profile developed from blood stains found on the knife.  Colombo testified that with respect to blood found on the handle of the knife:

> the probability of randomly selecting an [individual who was not related to V.R.] with a DNA profile matching the profile that I developed from the handle of the knife [was] approximately one in one billion in the Caucasian population.  [For the Black and Hispanic populations,] [i]t's one in greater than 6.5 billion, which is the approximate world population

Colombo also testified that V.R. could not be eliminated as a contributor to the DNA profile developed from blood stains found on the front left leg of the men's underwear.  Colombo explained that the probability of randomly selecting an individual unrelated to V.R. who would have the same DNA profile as the DNA found in the blood stain on the underwear was one in greater than 6.5 billion.

Neither Ramsey nor V.R. could be eliminated as contributors of the "wearer DNA," a mixture profile from the interior waistband of the men's underwear.  V.R. could not be eliminated as a contributor of a blood stain found on the black T-shirt found in the trash bag at Ramsey's residence.  Colombo testified the probability of randomly selecting an individual unrelated to V.R. who would have the same DNA profile as the DNA found on the T-shirt was

one in greater than 6.5 billion. Ramsey could not be eliminated as a contributor of "wearer DNA" found on the interior neck of the T-shirt. Colombo testified that all the probabilities she calculated were within a reasonable degree of scientific certainty.

Dr. Perlin prepared a report of his findings, and using text and graphs, the report explained how the probability of a DNA match was calculated:

> A match between the underpants waistband and Jonathan Ramsey is: 916 million times more probable than a coincidental match to an unrelated Black person[;] 103 million times more probable than a coincidental match to an unrelated Caucasian person[; and] 170 million times more probable than a coincidental match to an unrelated Hispanic person.
>
>    *    *    *    *    *    *    *
>
> A match between the underpants waistband and [V.R.] is: 297 thousand times more probable than a coincidental match to an unrelated Black person[;] 73 thousand times more probable than a coincidental match to an unrelated Caucasian person[; and] 51 thousand times more probable than a coincidental match to an unrelated Hispanic person.
>
>    *    *    *    *    *    *    *
>
> A match between the black T-shirt and Jonathan Ramsey is: 3,200 times more probable than a coincidental match to an unrelated Black person[;] 228 times more probable than a coincidental match to an unrelated Caucasian person[; and] 220 times more probable than a coincidental match to an unrelated Hispanic person.

When Dr. Perlin testified about these probabilities, he testified they were within a reasonable degree of scientific certainty.

Ramsey testified he broke into A.B.'s residence with E.V., E.V. told him a light was on in the basement and, fearing that someone was awake inside the residence, Ramsey left through the front door. Ramsey further testified he waited on a nearby park bench and he saw E.V. carrying V.R. over his shoulder into a wooded area, whereupon he ran in the opposite direction, hid in a sewer tunnel, smoked marijuana, and later took a circuitous route back to his house to avoid the police. Ramsey's defense sought to establish that E.V. committed the crimes,

contending E.V. either wore Ramsey's clothes during the crimes or used his clothing to wipe V.R.'s blood off items implicated in the offense and then discarded the clothing in Ramsey's trash.

## THE ADMISSIBILITY OF THE ALLELE FREQUENCY DATA EVIDENCE

Ramsey argues that the statistical analysis used to determine the likelihood that DNA profiles were contributed by the same individual, as testified by Colombo and Dr. Perlin, was inadmissible because the opinions were not based on the witnesses' observations.[2] In a statistical analysis of a DNA profile, the analyst determines the independent statistical likelihood of the observed alleles being present at the associated locus. The analyst relies upon allele frequency data, which tells the analyst how common each allelic reading is. Neither Colombo nor Dr. Perlin created the allele frequency database. It was compiled and created by the Virginia Department of Forensic Science, and the database is used in every DNA analysis performed by the Department of Forensic Science.

In Satcher v. Commonwealth, 244 Va. 220, 421 S.E.2d 821 (1992), the Supreme Court of Virginia stated DNA testing was established as a reliable scientific technique in a series of decided cases involving Timothy Wilson Spencer. Id. at 240-41, 421 S.E.2d at 833-34 (citing

---

[2] The Commonwealth argues that Ramsey waived any objection to Dr. Perlin's opinion regarding the allele frequency data because he did not object to the admission into evidence of Dr. Perlin's written report. "[I]f a trial court is aware of a litigant's legal position and the litigant did not expressly waive such arguments, the arguments remain preserved for appeal." Brown v. Commonwealth, 279 Va. 210, 217, 688 S.E.2d 185, 189 (2010). In this case, Ramsey filed a written motion to exclude testimony and reference by any expert regarding the statistical analyses performed on the DNA samples and the trial court held a hearing on the motion just prior to the start of Ramsey's trial. At a bench conference during Colombo's direct examination, Ramsey stated that he wanted to preserve his objections, he did not want to object each time a statistical analysis was given, and he asked the trial court to note his objection going forward. Thus, Ramsey did not object when the Commonwealth offered Dr. Perlin's report into evidence. However, the trial court was aware of Ramsey's legal position and no evidence establishes Ramsey waived his argument regarding the statistical analyses. Accordingly, Ramsey's objection to Dr. Perlin's opinion was preserved.

Spencer v. Commonwealth, 238 Va. 275, 384 S.E.2d 775 (1989); Spencer v. Commonwealth, 238 Va. 295, 384 S.E.2d 785 (1989); Spencer v. Commonwealth, 238 Va. 563, 385 S.E.2d 850 (1989)). Following the "Spencer decisions, the General Assembly enacted Code § 19.2-270.5 at its 1990 session." Satcher, 244 Va. at 241, 421 S.E.2d at 834.

Code § 19.2-270.5 provides in part:

> In any criminal proceeding, DNA (deoxyribonucleic acid) testing shall be deemed to be a reliable scientific technique and the evidence of a DNA profile comparison may be admitted to prove or disprove the identity of any person. This section shall not otherwise limit the introduction of any relevant evidence bearing upon any question at issue before the court, including the accuracy and reliability of the procedures employed in the collection and analysis of a particular DNA sample. The court shall, regardless of the results of the DNA analysis, if any, consider such other relevant evidence of the identity of the accused as shall be admissible in evidence.

Following the decision in Satcher and the enactment of Code § 19.2-270.5, this Court decided Hills v. Commonwealth, 33 Va. App. 442, 534 S.E.2d 337 (2000), rev'd on other grounds, 262 Va. 807, 553 S.E.2d 722 (2001).[3] In Hills, we found DNA testing results, including the database used to perform the testing as well as the DNA profile comparison, to be presumptively reliable and properly admitted, the issue having been determined by the legislature in Code § 19.2-270.5. Hills, 33 Va. App. at 452, 534 S.E.2d at 342.[4] See also Caprio

---

[3] The Supreme Court of Virginia reversed the Court of Appeals on an issue involving the questioning of prospective jurors during *voir dire* pursuant to the Supreme Court's decision in Fishback v. Commonwealth, 260 Va. 104, 532 S.E.2d 629 (2000). Hills, 262 Va. at 808, 553 S.E.2d at 723.

[4] Ramsey's challenge to the holding in Hills that the trial court's admission of DNA evidence was determined by statute is misplaced. This Court's determination of this point of law in Hills is consistent with the explicit statutory language found in Code § 19.2-270.5 as well as with legal precedent established by the Supreme Court of Virginia. Any conclusion to the contrary that may be implied as a result of this Court's decision in Corado v. Commonwealth, 47 Va. App. 315, 623 S.E.2d 452 (2005), must be rejected since it is premised on dicta in Hills, not on its holding. See Lofton Ridge, LLC v. Norfolk S. Ry. Co., 268 Va. 377, 383, 601 S.E.2d 648,

v. Commonwealth, 254 Va. 507, 512, 493 S.E.2d 371, 374 (1997) (finding that profile frequency extrapolation was a matter within the contemplation of Code § 19.2-270.5).

Based on the evidentiary rule established by Code § 19.2-270.5, we conclude the trial court properly admitted testimony by Colombo and Dr. Perlin regarding DNA testing, with all its constituent parts, including the DNA profile comparisons. Their calculation of the statistical probability of randomly selecting an individual with the profile unrelated to Ramsey was based on allele frequency data whose admissibility has been legislatively determined.

## EVIDENCE OF THIRD-PARTY GUILT

Ramsey argues the trial court erred by denying the admission into evidence of E.V.'s propensity for sexual predation, extraordinary violence, and lack of control at the time of the offenses against V.R. The trial judge admitted evidence that E.V. was convicted of a sex offense against a minor, that E.V. was on probation for the conviction, that E.V. was not performing well on probation, that E.V. was not attending sex offender treatment, and that E.V. was in the community when the crimes against V.R. were committed.

The right "to call for evidence in [one's] favor" is guaranteed by the Virginia Constitution. Va. Const. art. I, § 8; see generally Massey v. Commonwealth, 230 Va. 436, 442, 337 S.E.2d 754, 757-58 (1985); Cremeans v. Commonwealth, 104 Va. 860, 863, 52 S.E. 362, 363 (1905). "'In Virginia, evidence that a crime was actually committed by someone other than the accused is admissible for the purpose of generating a reasonable doubt of the guilt of the accused.'" Weller v. Commonwealth, 16 Va. App. 886, 890, 434 S.E.2d 330, 333 (1993)

---

651 (2004) (finding that an alternative justification for a ruling was unnecessary to the holding and was dicta). In Hills, after determining that the DNA profile comparison was admissible under Code § 19.2-270.5, this Court stated that the evidence was also admissible under Virginia case law. Hills, 33 Va. App. at 452-53, 534 S.E.2d at 342-43. That analysis was an alternative justification for the admission of the DNA profile comparison, was not necessary to the holding, and was dicta.

(quoting Charles E. Friend, The Law of Evidence in Virginia § 150 (3d ed. 1988)), aff'd on reh'g en banc, 443 S.E.2d 171 (1994). Evidence tending to show that someone other than the defendant committed the crime generally raises a factual question for the jury. Rees v. Commonwealth, 203 Va. 850, 869, 127 S.E.2d 406, 419 (1962). A defendant is entitled to present his version of the facts along with that of the prosecution so the jury may decide where the truth lies. Massey, 230 Va. at 442, 337 S.E.2d at 757-58. "We have stated that 'a large discretion must and should remain vested in the trial court as to the admission of this class of testimony.'" Johnson v. Commonwealth, 259 Va. 654, 681, 529 S.E.2d 769, 784 (2000) (quoting Karnes v. Commonwealth, 125 Va. 758, 766, 99 S.E. 562, 565 (1919)).

Ramsey correctly asserts that under Virginia law, once the appropriate nexus between a third party and the offense at bar has been established, evidence of the third party's guilt is to be liberally received by the trial court. Oliva v. Commonwealth, 19 Va. App. 523, 527, 452 S.E.2d 877, 880 (1995). Virginia courts have not yet ruled on whether a defendant's statements implicating a third party are, themselves, sufficient to create the necessary nexus between a third party and the offense at bar. However, under decided Virginia case law, the right to present evidence in one's defense does not permit a defendant to introduce evidence that merely suggests or insinuates that the third party may have committed the crime. Johnson, 259 Va. at 681, 529 S.E.2d at 784. "Such evidence is irrelevant; it tends to confuse and mislead a jury unless 'evidence [has been] introduced . . . [that] points directly to guilt of a third party.'" Oliva, 19 Va. App. at 527, 452 S.E.2d at 880 (quoting Weller, 16 Va. App. at 890, 434 S.E.2d at 333). "[O]nly 'where there is a trend of facts and circumstances tending clearly to point out some other person as the guilty party, may the [defendant] introduce any legal evidence which is available tending to prove that another person committed the crime with which he is charged.'" Id. (quoting Karnes, 125 Va. at 766, 99 S.E. at 565). Such proffered evidence need only raise a

- 9 -

question for the jury whether reasonable doubt of Ramsey's guilt existed, not whether the proffered evidence was sufficient to prove a third person committed the offenses. Id.

Accordingly, if the evidence Ramsey presented clearly or directly pointed to E.V. as the guilty party, the trial judge was required to admit that evidence which was relevant, material, and otherwise admissible. Id.

As in Johnson, the evidence proffered by Ramsey, "bore no direct relation to the crimes charged." Johnson, 259 Va. at 681, 529 S.E.2d at 785. While some similarities existed between E.V.'s prior misdemeanor sexual battery conviction and the instant offense, such as the victim was a young female in both cases, the few similarities fall short of establishing that the same individual committed all of these offenses. Beyond Ramsey's own testimony regarding the events, no facts or circumstances tending to show that E.V. was the guilty party were presented to the trial court. Neither the admitted evidence that E.V. was convicted of a sex offense against a minor, that E.V. was on probation for the conviction, that E.V. was not performing well on probation, that E.V. was not attending sex offender treatment, and that E.V. was in the community when the crimes against V.R. were committed, nor the excluded evidence of E.V.'s propensity for sexual predation, extraordinary violence, and lack of control at the time of the offenses against V.R. clearly or directly pointed to E.V. as the guilty party in the instant offense. See Oliva, 19 Va. App. at 527, 452 S.E.2d at 880.

Furthermore, any error by the trial court in failing to admit such evidence was harmless.[5]

The standard for non-constitutional error is established in Code § 8.01-678, which provides, in pertinent part:

---

[5] In his brief, Ramsey concedes that the admission of evidence of other offenses not committed by a defendant is determined by the standard principles of relevance and other applicable evidentiary rules, thus, any error was a non-constitutional error.

When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any . . . defect, imperfection, or omission in the record, or for any other error committed on the trial.

Additionally, Virginia courts

have applied Code § 8.01-678 in criminal as well as civil cases. In a criminal case, it is implicit that, in order to determine whether there has been "a fair trial on the merits" and whether "substantial justice has been reached," a reviewing court must decide whether the alleged error substantially influenced the jury. If it did not, the error is harmless.

Clay v. Commonwealth, 262 Va. 253, 259, 546 S.E.2d 728, 731 (2001) (citation omitted).

The test for non-constitutional harmless error is as follows:

"If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. . . . If so, or if one is left in grave doubt, the conviction cannot stand."

Id. at 260, 546 S.E.2d at 731-32 (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)).

In this case, the evidence presented at trial overwhelmingly points to Ramsey, and not E.V., as the perpetrator of the crimes committed against V.R. The facts and circumstances which were presented at trial showed that E.V. was not involved. E.V. was eliminated as a contributor of the DNA mixture from the tested portions of the blood-stained T-shirt, the men's underwear, the knife handle, a hair, and a sock found at Ramsey's residence. Ramsey's backyard was enclosed by a six-foot privacy fence with a door that latched from the inside and the T-shirt and men's underwear were found in trash bags inside Ramsey's backyard. Ramsey was arrested on August 31, 2011, and in a statement to Detective Jonathan Farrell shortly after his arrest, Ramsey

never stated that he broke into V.R.'s house with E.V., that he saw E.V. carry V.R. out of the house, or that E.V. committed the crimes. According to Farrell, Ramsey mentioned E.V. during the interview, but stated merely that E.V. "was the dude he got in trouble with." During the interview, Ramsey also told Farrell that his fingerprints would not be found at the scene and he repeatedly denied involvement in the crimes. However, Ramsey admitted that after his attorney told him about E.V.'s prior conviction, he started having discussions about finding a way to explain away his fingerprints found at the scene and to keep him from being connected to the more serious crimes of object sexual penetration, malicious wounding, and abduction with the intent to defile. Ramsey also admitted that he filed an inaccurate alibi notice stating he might present evidence he was at home at the time of the crimes. When E.V. was called by Ramsey as a witness at trial, he denied any involvement in the crimes. E.V.'s uncle testified that E.V. stayed at his house the night of the offenses and was asleep when he checked on him at approximately 2:30 a.m.[6] We conclude that the evidence that Ramsey committed the crimes was overwhelming and that any error by the trial court for refusing to admit the proffered evidence had no substantial influence on the verdict.

<u>QUASHING THE SUBPOENA <em>DUCES TECUM</em> FOR E.V.'S RECORDS AND<br>FORCING THE RETURN OF ALL THE DOCUMENTS</u>

Ramsey argues he was entitled to information contained in E.V.'s juvenile court records and records from E.V.'s mental health providers relating to the nature and details of E.V.'s probation for his prior sex conviction.

---

[6] Appellant testified that he sneaked out of his house and met E.V. at some time between midnight and 2:00 a.m., that he and E.V. smoked marijuana for over an hour until sometime after 2:00 a.m., and that they then split up to look for things to steal out of cars parked in the surrounding area before meeting again and deciding to break into the victim's home.

"[W]e review a trial court's decision regarding a motion to quash the issuance of a subpoena *duces tecum* 'under an abuse of discretion standard.'" Schwartz v. Commonwealth, 45 Va. App. 407, 450, 611 S.E.2d 631, 652 (2005) (quoting America Online, Inc. v. Anonymous Publicly Traded Co., 261 Va. 350, 359, 542 S.E.2d 377, 382 (2001)).

Code § 32.1-127.1:03(H) provides in part:

> Unless excepted from these provisions in subdivision 9, no party to a civil, criminal or administrative action or proceeding shall request the issuance of a subpoena *duces tecum* for another party's health records or cause a subpoena *duces tecum* to be issued by an attorney unless a copy of the request for the subpoena or a copy of the attorney-issued subpoena is provided to the other party's counsel or to the other party if *pro se*, simultaneously with filing the request or issuance of the subpoena. No party to an action or proceeding shall request or cause the issuance of a subpoena *duces tecum* for the health records of a nonparty witness unless a copy of the request for the subpoena or a copy of the attorney-issued subpoena is provided to the nonparty witness simultaneously with filing the request or issuance of the attorney-issued subpoena.

> No subpoena *duces tecum* for health records shall set a return date earlier than 15 days from the date of the subpoena except by order of a court or administrative agency for good cause shown. When a court or administrative agency directs that health records be disclosed pursuant to a subpoena *duces tecum* earlier than 15 days from the date of the subpoena, a copy of the order shall accompany the subpoena.

Through the use of a subpoena *duces tecum*, Ramsey obtained E.V.'s probation file from the Fairfax County Probation and Parole office.[7] Ramsey also subpoenaed Deepa Patel and Shannon Morris. Patel, a licensed clinical social worker, provided mental health services to juveniles referred by the juvenile and domestic relations district court. Morris, a licensed

---

[7] An attorney for Fairfax County appeared at the hearing and argued that the juvenile and domestic relations district court failed to contact him prior to producing the records and that the records were protected under Code § 16.1-305 and improperly disclosed to Ramsey. Code § 16.1-305 provides for the confidentiality of juvenile court records.

professional counselor employed at the Center for Clinical and Forensic Services, provided mental health services to juveniles referred by the juvenile and domestic relations district court. Patel and Morris provided services to E.V. and prepared reports regarding their treatment. The Commonwealth moved to quash the subpoenas because E.V.'s mental health records were protected by Code § 16.1-305 and Ramsey failed to comply with Code § 32.1-127.1:03(H).[8]

Relying upon Davis v. Alaska, 415 U.S. 308 (1974), Ramsey argued that the statute must yield to his superior right to produce evidence in his behalf. In addition to the subpoenas for Patel and Morris, Ramsey had also subpoenaed E.V. as a witness for the trial. The trial judge quashed the subpoenas for Patel and for Morris and ordered Ramsey to return E.V.'s juvenile probation records to the court. We find that the trial court did not abuse its discretion in its determination to protect the confidentiality of the subpoenaed records.

Ramsey contends on appeal that "[t]he trial court's prioritization of a state privacy law over Ramsey's state and federal constitutional rights contravened the Court's holding in Davis." We find that Ramsey's reliance on Davis is misplaced. In Davis, the appellant sought to introduce evidence that a prosecution witness was on probation for a juvenile conviction to establish the witness' possible bias and prejudice. Id. at 319. The Supreme Court held that a defendant's right of confrontation was paramount to the state's policy of protecting the confidentiality of a juvenile offender's record and that a defendant may cross-examine a witness about his juvenile record to show bias, and that, therefore, the witness' testimony "was either not to be believed . . . or at least very carefully considered in that light." Id. Here, Ramsey did not seek E.V.'s records in order to effectively cross-examine an adverse witness and ferret out possible bias and prejudice; E.V. was Ramsey's witness, not a prosecution witness. Moreover,

---

[8] According to the Commonwealth, Ramsey requested the issuance of the subpoena for the records on May 24, 2012, with a return date of May 31, 2012.

Davis does not hold that a defendant may circumvent the procedural requirements of state statutes to obtain records.[9]

Finally, since under Code § 16.1-305, E.V.'s juvenile probation records are confidential, their release is subject to the balancing test enunciated in Scott v. Commonwealth, 7 Va. App. 252, 372 S.E.2d 771 (1988). In Scott, this Court addressed a similar argument raised on appeal regarding confidential juvenile records which were protected under Code § 16.1-305. There, Scott assigned error to the trial court's refusal to allow him to review a non-party witness' entire juvenile court record. Scott, 7 Va. App. at 259, 372 S.E.2d at 775-76. Denying the requested review, the trial court, instead, directed the Commonwealth to review the record and disclose to Scott only convictions of felonies and crimes of moral turpitude. Id. at 259, 372 S.E.2d at 776. This Court affirmed the trial court's adoption of this procedure and cited the holding and reasoning in Pennsylvania v. Ritchie, 480 U.S. 39 (1987), "that [appellant] had a due process, rather than a confrontation, right to have the [confidential] records of the agency turned over to the trial court for in-chambers review and release to him of material information for his defense," thus balancing "the accused's rights and the state's interest in protecting confidential records." Scott, 7 Va. App. at 261, 372 S.E.2d at 776-77.

We conclude the trial court did not abuse its discretion in balancing Ramsey's rights and the Commonwealth's interest in protecting confidential records by quashing the subpoenas and ordering the return of E.V.'s records to the court while allowing Ramsey to admit evidence that E.V. was convicted of a sex offense against a minor, that E.V. was on probation for the conviction, that E.V. was not performing well on probation, that E.V. was not attending sex

---

[9] Ramsey failed to comply with Code § 32.1-127.1:03(H) when he sought to subpoena E.V.'s probation file from the Fairfax County Probation and Parole office.

offender treatment, and that E.V. was in the community when the crimes against V.R. were committed.

## THE TRIAL COURT'S DENIAL OF RAMSEY'S MOTION TO DECLARE E.V. A HOSTILE WITNESS

Ramsey argues the trial court erred in denying his motion to declare E.V. an adverse witness prior to and during direct examination by defense counsel because E.V. had an interest in the Commonwealth convicting another individual for the offenses that he would otherwise have been suspected of committing.

Code § 8.01-401(A) provides that "[a] party called to testify for another, having an adverse interest, may be examined by such other party according to the rules applicable to cross-examination." The predecessor statute contained the identical language and was construed by the Supreme Court as follows:

> It is clear that the intent of the legislature was, first, to compel a litigant, if called by another party to the cause, to testify in behalf of such other party; and, second, to permit any litigant to call and cross-examine any person "having an adverse interest" in the outcome of the litigation, whether or not a party. The only conclusion to be drawn from the language of the act and the context of the words, "having an adverse interest," is that the legislature intended to include, first, a party to the litigation, and, second, a person, though not a party, who had a financial or other personal interest in the outcome. The legislature did not mean to include a party merely because his testimony was or would be adverse to the party calling him. "Adverse interest" was used in its common and accepted meaning and was not used synonymously with "adverse testimony."

Whitehead v. Commonwealth, 31 Va. App. 311, 316-17, 522 S.E.2d 904, 907 (2000) (quoting Butler v. Parrocha, 186 Va. 426, 431-32, 43 S.E.2d 1, 4 (1947)).

"Additionally, the Virginia Supreme Court has held that Code § 8.01-401 also applies 'where the witness has no adverse interest, but is shown to be adverse or hostile to the party

introducing him.'"  Weller, 16 Va. App. at 892, 434 S.E.2d at 335 (quoting Nelson v.

Commonwealth, 153 Va. 909, 919, 150 S.E. 407, 410 (1929)).

> We review a trial court's ruling that a witness is a hostile
> witness under an abuse of discretion standard.  The trial court
> determines whether a witness is hostile or adverse because "the
> trial court sees and hears the witness on the stand, observes his
> demeanor, and hence is in a much better position to determine
> whether he is in fact adverse or hostile than is an appellate court
> which must rely on the printed record."

Teleguz v. Commonwealth, 273 Va. 458, 479, 643 S.E.2d 708, 722 (2007) (quoting Virginia

Elec. & Power Co. v. Hall, 184 Va. 102, 105, 34 S.E.2d 382, 383 (1945)) (internal citation

omitted).

Ramsey called E.V. as a witness and, prior to asking E.V. questions, Ramsey's defense

counsel moved he be permitted to treat E.V. as an adverse witness.  The trial judge denied the

motion and stated Ramsey could renew the motion if E.V. proved to be adverse during his

testimony.  During defense counsel's direct examination of E.V., the prosecutor objected to

multiple questions as being argumentative, repetitive, or leading.  At one point, defense counsel

renewed his motion to treat E.V. as an adverse witness.  In denying the motion, the trial judge

stated, "The only person hostile is you."  Later, Ramsey recalled E.V. as a witness and, after

asking E.V. numerous questions, defense counsel renewed his motion to treat E.V. as an adverse

witness because E.V. was not answering his questions.  The trial judge stated she thought that

E.V. was "just thoroughly confused" and stated that she was also confused due to the nature of

defense counsel's questions.  The trial judge stated, "I think he's sincerely confused by – he

thinks he's answered these questions in a straightforward manner and you keep asking him again

and again and now he's thoroughly confused I think [that] is what's going on."  After hearing

further argument by defense counsel, the prosecutor, and E.V.'s counsel, the trial judge stated:

> I think it's because of the repetitiveness of the questions, I assume, and I've observed his demeanor and I believe he is sincerely confused.
>
> I don't think he's hostile. I think he's trying to do the best he can to answer your questions. I think he's, in fact, been cooperative, but confused.

There was no evidence that E.V. had a financial or personal interest in the outcome of Ramsey's trial so as to render him "adverse" within the meaning of Code § 8.01-401(A). Ramsey's defense that E.V. may have committed the crimes does not require the trial court to find that E.V. had an "adverse interest." See Weller, 16 Va. App. at 893, 434 S.E.2d at 335 (finding that "the evidence [appellant] alleges tends to show that [the witness] may have committed the crimes does not warrant a finding that [the witness] had an 'adverse interest'" because "[t]he trial court was entitled to find that the evidence [which appellant claimed implicated the witness] did not demonstrate that [the witness] had a personal interest in the outcome of the trial"). Similarly, Ramsey has failed to establish that E.V. was adverse or hostile *in fact*. The trial judge observed E.V.'s demeanor and found that he was trying to do his best to answer defense counsel's questions. She noted that E.V. was confused, noting that she was also confused by defense counsel's questions. Based upon a review of the record, we cannot say the trial court abused its discretion in denying Ramsey's request to declare E.V. an adverse witness.

## CONCLUSION

Based upon the foregoing reasons, we affirm Ramsey's convictions.

Affirmed.