UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges O'Brien, Malveaux and Senior Judge Clements
Argued at Richmond, Virginia

RASHARD S. CUTLER, S/K/A
  RASHARD SANDERS CUTLER

                                                        MEMORANDUM OPINION* BY
v.       Record No. 1261-18-2                   JUDGE MARY BENNETT MALVEAUX
                                                              DECEMBER 17, 2019
COMMONWEALTH OF VIRGINIA


                   FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                             Margaret P. Spencer, Judge Designate

               Lauren Whitley, Deputy Public Defender, for appellant.

               Victoria Johnson, Assistant Attorney General (Mark R. Herring,
               Attorney General, on brief), for appellee.


        Rashard Sanders Cutler ("appellant") was convicted of malicious wounding, in violation of

Code § 18.2-51, use of a firearm during the commission of malicious wounding, in violation of

Code § 18.2-53.1, second-degree murder, in violation of Code § 18.2-32, and use of a firearm in the

commission of a murder, in violation of Code § 18.2-53.1.  On appeal, he argues that the trial court:

(1) abused its discretion by refusing to admit relevant evidence that a third party committed the

shootings of Antonio Sherman and Christina Johnson; (2) violated his Sixth and Fourteenth

Amendment rights under the United States Constitution, and his Virginia constitutional right to call

for evidence in his favor, when it refused the introduction of evidence relevant to his theory of

defense; and (3) erred in allowing the Commonwealth to impeach its own witness.  For the

following reasons, we affirm.

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. BACKGROUND

<u>The Commonwealth's Evidence</u>

On the evening of October 18, 2014, Christina Johnson hosted a "stripper party" at her apartment. The party included a bar, music, and several female dancers. Johnson charged a fee for entry into the party. Approximately twenty-five people were in attendance. Johnson's bedroom, located in the back of the apartment, served as the dressing room for the dancers. Because the dancers were changing in her bedroom, Johnson did not allow guests into the area. The party was held in the living room, with the bar in the dining room.

During the party, Johnson's brother, Thomas Hardy, stood at the apartment's front door and patted down guests to ensure that they did not enter with any weapons. Some of Johnson's friends, including Calvin Williams and Rashon Aboite (also known as "Rude Boy"), served as security guards to keep patrons out of the bedroom area. Dajon Johnson[1] came to the party that night with Elijah Gee. Dajon Johnson was wearing a "walking boot" cast on his foot. Sometime prior to the party, he and Gee had traded weapons—Dajon Johnson gave Gee his nine-millimeter firearm in exchange for a .40 caliber firearm from Gee. Dajon Johnson and Gee brought these guns to the party. When Hardy attempted to search them at the door, they left the apartment and went to their car. Dajon Johnson testified that Gee left his nine-millimeter firearm in the car but admitted that he was able to hide the .40 caliber handgun in his walking boot and take it into the party.

Eric Early went to Johnson's party to help with security and had a .45 caliber firearm with him at the time. When he got to the party, he put the gun in a bag by a window. At some point during the evening, Early gave Aboite the bag containing the .45 gun, and Aboite took the

---

[1] There is no indication in the record that Dajon Johnson and Christina Johnson are related.

bag to the back of the apartment. Matthew Green and his cousin, Antonio Sherman, also attended the party. When they arrived at the apartment, Hardy patted them down for weapons. Green and Sherman then sat down on the couch in the living room to watch the dancers.

Later that evening, Christina Johnson saw several men, including Elijah Gee, Dajon Johnson, and appellant, in the back hallway of the apartment. Because she saw "a lot of commotion" and heard "cussing," she went to the back hallway and told the men to leave the area because they were not supposed to be there. The group would not leave, so one of her "security" told them that they had to get out of the hallway and that they could "either respect it or check it." Appellant said, "I could check it for you. I have a check that's ready." Christina Johnson then stepped between appellant and her security guard and told appellant to leave. Appellant swung past her and attempted to hit her security guard but missed.

At that point, Thomas Hardy grabbed appellant and forcibly escorted him from the back hallway to the front door. As Hardy opened the door, Dajon Johnson pulled appellant back into the apartment and said, "He's good," but Hardy told them that they could not stay because of the fighting. Dajon Johnson then saw a man inside the apartment "come around the corner with [a] gun," so he fired two shots in the air with his .40 caliber firearm. Appellant was right next to him when he fired the shots. Dajon Johnson testified that Elijah Gee was not with them at that time.

When Dajon Johnson fired into the air, appellant pulled out a gun, stated that he would "light this bitch up," and started to shoot. Christina Johnson, who knew appellant because they had attended high school together, testified that appellant was the shooter and that he fired towards her and her security guard. To her, it looked "like [appellant] was tripping out the door as he was shooting." Thomas Hardy was unable to identify the shooter because it was "too dark"

- 3 -

and "very crowded" in the apartment. However, he testified that Elijah Gee was not the individual he escorted to the front door who started shooting.

After the gunshots, Christina Johnson went into her bedroom, where she discovered that she had been shot in the left side of her abdomen.

Matthew Green and Antonio Sherman had been sitting on a couch in the living room during the altercation. After the gunfire, Sherman went to Johnson's bedroom, where she saw him collapse on one of her beds. Green came into the room and saw Sherman sitting up and holding his chest. He moved Sherman to the front of the apartment and waited until paramedics arrived.

After Eric Early heard the shots, he walked around the apartment to check on other people. Early also heard shooting outside of the apartment building. Aboite came back inside the apartment and gave Early's .45 caliber firearm back to him. Early put it back in his bag and tried to leave but could not because police had arrived.

Police arrived and found Elijah Gee lying face down on the outside front steps of the apartment building. Gee was dead when the officers found him.

Police also found shell casings on the interior staircase leading to Christina Johnson's second-floor apartment. When the officers entered the apartment, they found Sherman dead in Green's arms in the living room. Elijah Gee's cause of death was later determined to be a gunshot wound to the right side of his chest. The medical examiner recovered the bullet from Gee's body, which subsequent forensic testing determined was fired from Eric Early's .45 caliber handgun. Antonio Sherman's cause of death was a gunshot wound to the left side of his back. The medical examiner recovered a nine-millimeter bullet from Sherman's body.

Just inside the apartment's doorway, a forensic technician found two .40 caliber cartridge casings. Investigators also recovered six nine-millimeter cartridge casings from the interior

- 4 -

stairs of the apartment building that led to Johnson's apartment and the area around and just inside the apartment's front door. They also found five nine-millimeter bullets in various locations inside the apartment. Forensic testing determined that each of the nine-millimeter cartridge casings came from bullets fired by the same gun. An intact .45 caliber cartridge was found in the apartment's back bedroom.

Elijah Gee and Eric Early were tested for gunshot residue, which was found on samples from the right hand and the left hand of both individuals.

On October 27, 2014, Detective Arcellious Demery, Jr. of the Richmond Police Department interviewed appellant. Appellant initially told the detective that he was not at the party; he later said that when he arrived, he saw the police and left. However, after Detective Demery read appellant the offenses with which he was being charged, appellant stated that he was at the party and that an altercation had occurred. He told the detective that he was thrown out of the party and that at that point he saw a man come from the back hallway firing a gun. Appellant stated that his friend Elijah Gee "fired some shots back." Appellant said that he then took off running and that "as he was running . . . the guy beside [Gee] fired some more shots." He stated that he had not been involved with the altercation in the back hallway. Throughout the interview, appellant denied ever shooting anyone at the party.

During the interview, appellant also told Detective Demery that he currently owned a .45 caliber firearm and that he had bought a nine-millimeter firearm in June 2014 but that it had been stolen from his car. He said that the theft had occurred a few months prior to the party and that he had not reported it because he did not have the gun's serial number. When Detective Demery showed appellant a picture of appellant holding a nine-millimeter firearm "exactly like the one that he had originally purchased," appellant stated that the photograph had been taken about a month prior to the party. He also said that the firearm in the photograph was not his, but that

"somebody else in the group had that gun, and it reminded him so much of his [firearm that had been stolen] that he wanted to take a picture with it." Appellant also told the detective that he did not know Dajon Johnson, who was pictured beside him in the photograph. He later told Detective Demery that he did know Dajon Johnson, that Johnson was the person who shot first at the party, and that the individual coming from the back hallway fired back in self-defense.

Motion *in Limine*

During appellant's first jury trial, his theory of the case was that Elijah Gee had possessed the nine-millimeter firearm at the party and was the individual who had shot into the apartment. During opening statement, counsel for appellant supported this theory by asserting that Rashon Aboite had not been prosecuted for Elijah Gee's death because he had killed Gee in self-defense; this proved, counsel argued, that Gee had possessed a weapon. Thus, Gee—not appellant—was the person who had shot into the crowd in response to seeing Aboite with a firearm. Counsel for appellant told the jury,

> Rashon Aboite . . . wasn't even arrested for this. Isn't in jail. They said it was self-defense. If a 9mm or if a gun was being fired at him, if that was the self-defense, then who had the 9mm?
>
> Obviously, it had to be Elijah Gee. Obviously. Otherwise, [Aboite] would be in jail today. And you are going to find this out when I cross-examine him.

Appellant testified in his own defense. Rashon Aboite did not testify at trial.

After the jury advised that it was unable to make a decision, the court declared a mistrial.

Prior to retrial, the Commonwealth filed a motion *in limine* asking the court "to exclude evidence, questions, testimony and argument concerning deals or suspected deals" that Aboite "may have made with the Commonwealth in exchange for his testimony unless or until he testifies at trial." The Commonwealth proffered in its motion that Aboite "was involved in an incident immediately after the killing and malicious wounding that [appellant] is charged in that

- 6 -

resulted in what was deemed a justified killing of one of [appellant's] associates." The Commonwealth represented that no "deal" was ever made with Aboite, that he did not testify at the first trial, and that he was not expected to testify at retrial. The Commonwealth conceded that, were Aboite to testify, questions regarding any consideration he received for his testimony would be proper, but that, in the absence of testimony from Aboite, "any mention of potential consideration offered to [him] is not relevant, nor would it be admissible under the Virginia Rules of Evidence" and would "serve[] only to confuse and mislead the jurors."

At the hearing on the motion, both parties asked the trial court to review the transcript of the first trial.[2] The court agreed and continued the motion.

The trial court subsequently granted the Commonwealth's motion *in limine*, ruling that appellant could not introduce evidence about "a deal or an agreement with the Commonwealth."

<u>The Second Trial</u>

Appellant's theory of the case remained the same at his second trial: that Elijah Gee had possessed a nine-millimeter firearm at the party and had shot into the crowd after seeing Rashon Aboite emerge from the back hallway with a gun in his hand. Appellant further alleged that Aboite had followed Gee out of the apartment, saw Gee with a gun in his hand, and shot and killed Gee.

Detective Demery testified regarding appellant's testimony at the first trial. The detective stated that appellant had admitted taking a .45 caliber handgun to the party but said that he had not brought a nine-millimeter handgun. The detective also testified that appellant had admitted that he was involved with an altercation with Aboite in the back hallway. Demery said

---

[2] Judge Gregory L. Rupe presided over appellant's first trial, while Judge Designate Margaret P. Spencer presided over the retrial.

that appellant stated that he saw Aboite come around a corner with a gun and that he pulled his gun out at that time but did not fire it.

On cross-examination, Detective Demery acknowledged that Elijah Gee and Dajon Johnson had bought nine-millimeter ammunition the day of the party. The detective also stated that Dajon Johnson had previously told him in an interview that Gee had initially taken the nine-millimeter firearm back to the car but later went back to retrieve it.

Dajon Johnson testified at the second trial. On cross-examination, he admitted that he and Elijah Gee had traded guns at some point prior to the party: Dajon Johnson gave Gee his nine-millimeter, and Gee gave Dajon Johnson the .40 caliber handgun he carried into the party. Dajon Johnson also testified on cross-examination that he and Gee had purchased nine-millimeter ammunition the day of the party, but he denied that Gee had left the party and retrieved the nine-millimeter gun from the car.

Douglas DeGaetano, the forensic scientist who analyzed the primer, or gunshot, residue in the case, testified that he "found particles that are characteristic of primer residue" in the samples taken from each of Elijah Gee's and Eric Early's hands. He also testified that finding primer residue on someone's hands was "simply consistent with either the person having fired, been in proximity, handled the weapon, or c[o]me into contact with someone who had primer residue on them."

Calvin Williams testified at trial that he attended the party to assist Christina Johnson with security. At some point during the evening, he saw a crowd in the hallway, and also saw a person who had been standing near the front door escort someone to that front door. Williams then heard gunshots coming from around the front door, and he went into the kitchen. He stated that he saw Christina Johnson walking around but did not see her injury. The Commonwealth's attorney asked Williams if he had seen someone on the floor of the apartment, and Williams

responded, "No." At that point, the Commonwealth's attorney asked Williams, "[D]o you remember talking to me and Detective Sergeant Edwards?" Counsel for appellant objected, arguing that the Commonwealth was attempting to impeach its own witness. The trial court stated, "That's permissible." The following exchange then occurred:

> COMMONWEALTH'S ATTORNEY: Do you remember talking to us about this specific incident?
>
> WILLIAMS: Yes.
>
> COMMONWEALTH'S ATTORNEY: And do you remember telling us that you did see somebody getting taken out of the party by the big guy working at the front door?
>
> WILLIAMS: Yes.
>
> COMMONWEALTH'S ATTORNEY: Do you remember telling us that you saw that person turn around and start shooting into the crowd?
>
> WILLIAMS: No, I did not say that it was that exact person.
>
> COMMONWEALTH'S ATTORNEY: Do you remember saying that you saw that person, kind of, look as though they were tripping and then start firing?
>
> WILLIAMS: Yes. I said I saw somebody fall to the ground and was shooting.
>
> COMMONWEALTH'S ATTORNEY: So that's different than what you just said that you didn't see anyone firing, right?
>
> WILLIAMS: No. I said I saw someone shooting.
>
> COMMONWEALTH'S ATTORNEY: Okay. And it was the person towards the front door that was kind of falling or losing their balance?
>
> WILLIAMS: Yes.
>
> COMMONWEALTH'S ATTORNEY: Do you remember telling us that you did see Christina with a gunshot wound?
>
> WILLIAMS: Yes. Later on, that was after I checked everyone.

COMMONWEALTH'S ATTORNEY: Right. And that later on after you checked off people, that you did see someone laying on the floor of the apartment also shot?

WILLIAMS: Yes. I saw him actually moving around, I actually asked him was he okay.

COMMONWEALTH'S ATTORNEY: All right. And what ultimately happened with that?

WILLIAMS: He didn't respond.

COMMONWEALTH'S ATTORNEY: Ultimately, did you see him die on the floor?

WILLIAMS: I did not see him die on the floor. He walked back to the living room.
That's where he died at.

Neither Rashon Aboite nor appellant testified at the second trial.

The jury found appellant guilty of malicious wounding, use of a firearm during the commission of malicious wounding, second-degree murder, and use of a firearm in the commission of a murder.

Appellant filed a motion for new trial, arguing that the trial court's ruling on the motion *in limine* violated his right to due process under the Fourteenth Amendment. During the sentencing hearing, the trial court denied the motion.

This appeal followed.

## II. ANALYSIS

### A. Evidence of Third-Party Guilt

Appellant argues that the trial court abused its discretion in refusing to admit relevant evidence that a third party, Elijah Gee, shot Antonio Sherman and Christina Johnson.[3]

---

[3] Appellant also argues, in his second assignment of error, that the trial court's refusal to admit evidence relevant to this theory of defense implicated his Fourteenth Amendment right to due process, his Sixth Amendment right to present a defense, as well as his Virginia

"We review the [trial] court's ruling concerning admissibility of evidence for an abuse of discretion." Lambert v. Commonwealth, 70 Va. App. 54, 60 (2019).

"In Virginia, evidence that a crime was actually committed by someone other than the accused is admissible for the purpose of generating a reasonable doubt of the guilt of the accused." Juniper v. Commonwealth, 271 Va. 362, 411 (2006) (quoting Weller v. Commonwealth, 16 Va. App. 886, 890 (1993), aff'd on reh'g en banc, 443 S.E.2d 171 (1994)). "Such proffered evidence need only raise a question for the jury whether reasonable doubt of [the accused's] guilt existed, not whether the proffered evidence was sufficient to prove a third person committed the offenses." Ramsey v. Commonwealth, 63 Va. App. 341, 355 (2014).

However, "[p]roffered evidence 'that merely suggests a third party *may* have committed the crime charged is inadmissible; only when the proffered evidence tends *clearly* to point to some other person as the guilty party will such proof be admitted.'" Johnson v. Commonwealth, 259 Va. 654, 681 (2000) (quoting Soering v. Deeds, 255 Va. 457, 464 (1998)). Therefore, "under decided Virginia case law, the right to present evidence in one's defense does not permit

---

constitutional right to call for evidence in his favor. Finding that appellant failed to properly preserve these arguments, we decline to address them on appeal.

Appellant never argued before the trial court that the exclusion of the evidence that Rashon Aboite had not been prosecuted for Elijah Gee's killing violated his Sixth Amendment right to present a defense, or his Virginia constitutional right to call for evidence in his favor; therefore, he has waived these arguments on appeal. See Rule 5A:18.

Appellant did argue in his motion for a new trial that the exclusion of this evidence violated his due process rights under the Fourteenth Amendment. However, "Rule 5A:18 requires both the objection and the 'grounds therefor' to be made 'at the time of the ruling.'" Roadcap v. Commonwealth, 50 Va. App. 732, 740 n.1 (2007). "A litigant . . . cannot wait until *after* trial to present foundation evidence pertinent to a trial court's decision *during* trial to allow or exclude testimony." Id. Here, appellant did not make the trial court aware of his objection to the exclusion of the evidence on due process grounds at the time of the motion *in limine* or at any point during trial. We consider this post-trial argument regarding an evidentiary issue untimely made. Thus, appellant has also waived this argument on appeal. See Boblett v. Commonwealth, 10 Va. App. 640, 650-51 (1990) (finding that defendant had not preserved his argument that the trial court erred in limiting the testimony of his expert witness when the argument was raised for the first time in a post-trial motion to set aside the verdict because "[i]n order for an objection to be timely, it must be made when the evidence is offered or the ruling given").

- 11 -

a defendant to introduce evidence that merely suggests or insinuates that the third party may have committed the crime." Ramsey, 63 Va. App. at 354. "Such evidence is irrelevant; it tends to confuse and mislead a jury unless 'evidence [has been] introduced . . . [that] point[s] directly to guilt of a third party.'" Oliva v. Commonwealth, 19 Va. App. 523, 527 (1995) (alterations in original) (quoting Weller, 16 Va. App. at 890). Thus, an accused may introduce evidence of third-party guilt "only 'where there is a trend of facts and circumstances tending clearly to point out some other person as the guilty party.'" Id. (alteration in original) (quoting Karnes v. Commonwealth, 125 Va. 758, 766 (1919)). Further, "[a]lthough circumstantial evidence tending to prove the guilt of a third party is to be liberally received, the evidence must be legally admissible. That is, the evidence must be relevant and material, and may not be hearsay." Weller, 16 Va. App. at 890 (citation omitted). Finally, "a large discretion must and should remain vested in the trial court as to the admission of this class of testimony." Johnson, 259 Va. at 681 (quoting Karnes, 125 Va. at 766).

Appellant contends that the trial court erred in ruling that he could not introduce evidence that Rashon Aboite was not prosecuted for the killing of Elijah Gee because the Commonwealth deemed this killing justified.[4] He argues that this fact tended to prove that Gee possessed a firearm at the party—because Gee had a firearm, Aboite was not prosecuted for his killing, as it was deemed justified. Therefore, appellant asserts that this evidence was relevant to his theory of defense: that Gee shot Antonio Sherman and Christina Johnson with a firearm that he possessed on the night in question. Thus, any evidence that tended to prove this fact, including

---

[4] The trial court's specific ruling was that appellant could not introduce evidence about Rashon Aboite having "a deal or an agreement with the Commonwealth." For the purpose of this appeal, we construe this ruling to include prohibiting appellant from introducing any evidence that Aboite was not prosecuted for the killing of Gee.

the Commonwealth's decision not to charge Aboite with the shooting of Gee because Aboite was acting in self-defense, was relevant.

We find no merit in appellant's argument that the trial court abused its discretion in refusing to admit this evidence. In the instant case, the proffered evidence—the fact that Aboite was not charged with the murder of Elijah Gee because it was deemed a justified killing—did not "tend[ ] clearly to point" to Gee as the guilty party. Johnson, 259 Va. at 681. Here, the evidence was not relevant to the incident for which appellant was on trial—the shooting into the apartment from the doorway, resulting in the murder of Antonio Sherman and the malicious wounding of Christina Johnson. Instead, the proffered evidence was only probative of a separate incident that was not a part of the offenses at trial—the killing of Elijah Gee that occurred outside Christina Johnson's apartment *after* the shooting that occurred inside her apartment. While this killing was not a part of the offenses for which appellant was on trial, evidence in the record established that the killing of Gee occurred after the shooting into Johnson's apartment. At trial, Eric Early testified that he heard shooting outside of the apartment building after the initial shooting in the living room. Rashon Aboite came back inside the apartment after this second round of shooting and returned Early's .45 caliber firearm to him. Gee was found dead by police on the outside front steps of the apartment building, and forensic testing of the bullet recovered from Gee's body determined that it was fired from Early's .45 caliber handgun. Thus, the evidence indicated that Elijah Gee's death, caused by Aboite, occurred outside the apartment building following the shooting that occurred inside the apartment. Although it is a reasonable inference that the Commonwealth deemed Gee's death a justified killing because Gee had a gun at the time Aboite shot him, this inference does not directly point to Gee as the person who shot into the apartment, killing Sherman and injuring Johnson. The fact that Gee might have had a firearm during the

night in question provided no more than speculation that this firearm was also the nine-millimeter firearm that was used to fire into the apartment.[5]

The evidence that Aboite was not prosecuted for Gee's killing only tends to prove that Gee may have had a firearm outside of the apartment building when he was killed by Aboite. This evidence, at most, merely suggested or insinuated that Gee may have committed the offenses in the instant case. Because such evidence is inadmissible to prove third-party guilt, we hold that the trial court did not abuse its discretion in excluding the proffered evidence.

### B. Impeachment of the Commonwealth's Own Witness

Appellant also contends that the trial court erred in allowing the Commonwealth to impeach its own witness.

"As a general rule at common law, a party was not allowed to impeach its own witness." Maxey v. Commonwealth, 26 Va. App. 514, 518 (1998). However, "Virginia has enacted two statutes that impact the common law rule." Id. One of these statutes, Code § 8.01-403, "allows a party to impeach his or her own witness by prior inconsistent statements only when the witness whom the party expected to testify favorably has suddenly given unexpected, adverse testimony

---

[5] We further note that the trial court's narrow ruling regarding the evidence that Rashon Aboite was not prosecuted for Elijah Gee's death did not prevent appellant from eliciting other evidence to indicate that Gee may have had a nine-millimeter firearm during the night in question. On cross-examination, Detective Demery admitted that Gee and Dajon Johnson had bought nine-millimeter ammunition the day of the party. The detective also testified that Dajon Johnson had previously told him in an interview that Gee had taken the nine-millimeter firearm to the car but later went back to retrieve it. On cross-examination, Dajon Johnson admitted that he and Gee had traded guns at some point prior to the party, and therefore Gee possessed a nine-millimeter firearm at the time of the party. Douglas DeGaetano testified that he found primer residue in the samples taken from Gee's hands. Here, appellant was able to present his theory of the case—that Gee had a nine-millimeter firearm at the party and was the shooter, rather than appellant—without the evidence that Aboite was not prosecuted for Gee's death. Thus, it is clear that the court did not abuse its discretion in prohibiting evidence regarding a separate incident—the fact that Aboite was not prosecuted for Gee's killing—when appellant was allowed to present evidence as to his theory of defense.

on the stand."[6] Id. at 520. Further, "'[i]n order to impeach one's own witness . . . it is not sufficient merely that the witness gave a contradictory statement on a prior occasion.' Rather, the 'testimony offered must be injurious or damaging to the case of the party who called the witness.'" Ragland v. Commonwealth, 16 Va. App. 913, 920-21 (1993) (citation omitted) (quoting Brown v. Commonwealth, 6 Va. App. 82, 85 (1988)). When the "testimony is of a negative character and has no probative value, there is no need to discredit the witness." Smallwood v. Commonwealth, 36 Va. App. 483, 489 (2001) (quoting Virginia Elec. & Power Co. v. Hall, 184 Va. 102, 106 (1945)).

In the case before us, the Commonwealth's attorney asked Calvin Williams if he had seen someone on the floor of the apartment after hearing gunshots, and Williams responded, "No." At that point, the Commonwealth's attorney asked Williams, "[D]o you remember talking to me and Detective Sergeant Edwards?" Counsel for appellant objected, arguing that the Commonwealth was attempting to impeach its own witness. The trial court stated, "That's permissible." The Commonwealth then elicited testimony from Williams regarding prior statements that he remembered making to the detective: that he remembered stating that he saw someone being taken out of the party by "the big guy" working at the front door, that he remembered stating that he saw somebody falling to the ground and shooting, and that he remembered stating that after he checked on everyone he saw Christina Johnson with a gunshot wound. Williams also testified that he did see someone lying on the floor of the apartment and that he saw this individual die in the living room.

---

[6] In contrast, Code § 8.01-401 permits a party to call a witness "having an adverse interest" and examine such witness "according to the rules applicable to cross-examination." Code § 8.01-401(A). The statute contemplates individuals with a "financial *or other personal interest* in the outcome of the case." Maxey, 26 Va. App. at 520. In this case, Calvin Williams was not called as an adverse witness under Code § 8.01-401.

Here, the initial question was whether Williams had seen someone on the floor of the apartment, to which Williams replied "No." This answer was in direct contradiction to an earlier statement he had made to the detective. In determining whether the Commonwealth's use of Williams' prior inconsistent statement constituted proper impeachment, we find Brown v. Commonwealth, 6 Va. App. 82 (1988), instructive. In Brown, a witness testified that he "had not seen the stabbing" for which defendant was on trial, in direct contradiction to his earlier statement to investigators that he had witnessed the stabbing. Id. at 83. We held that this testimony lacked probative value and was not "damaging or injurious to the Commonwealth's case." Id. at 86. Because it "could not have assisted the trier of fact in determining [defendant's] guilt or innocence," it was not subject to impeachment. Id.

Similarly, Williams' testimony that he did not see anyone on the floor was neither damaging nor injurious to the Commonwealth's case, nor could it have helped the jury determine appellant's guilt or innocence. Thus, as in Brown, Williams' testimony was not subject to impeachment by the Commonwealth. Therefore, the trial court erred when it allowed the Commonwealth to impeach Williams with his prior inconsistent statement.

However, "[w]e will not reverse a trial court for evidentiary errors that were harmless to the ultimate result." Shifflett v. Commonwealth, 289 Va. 10, 12 (2015). "Under the harmless error doctrine, if there was 'a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . for any . . . defect, imperfection, or omission in the record, or for any error committed on the trial.'" Id. (alterations in original) (quoting Code § 8.01-678). Here, "we apply the standard for non-constitutional harmless error, which is that such error is harmless if we can be sure that it did not 'influence the jury' or had only a 'slight effect.'" Id. (quoting Clay v. Commonwealth, 262 Va. 253, 260 (2001)). "An error is harmless 'if "other evidence of guilt is 'so overwhelming and the error so insignificant by comparison that

the error could not have affected the verdict,'" or "even if the evidence of the defendant's guilt is not overwhelming, . . . if the evidence admitted in error was merely cumulative of other, undisputed evidence."'" Salahuddin v. Commonwealth, 67 Va. App. 190, 212 (2017) (alteration in original) (quoting McLean v. Commonwealth, 32 Va. App. 200, 211 (2000)); see also Massey v. Commonwealth, 230 Va. 436, 442 (1985) ("Cumulative testimony is repetitive testimony that restates what has been said already and adds nothing to it. It is testimony of the same kind and character as that already given.").

We conclude that the error in allowing the Commonwealth to impeach Williams with his prior inconsistent statement was harmless, as this evidence was cumulative of other undisputed evidence. After asking Williams if he remembered previously discussing the case, the Commonwealth was able to elicit testimony from him that he saw someone being taken out of the party by "the big guy" working at the front door; saw somebody falling to the ground and shooting; remembered stating that after he checked on everyone he saw Christina Johnson with a gunshot wound; and saw someone lying on the floor of the apartment. The evidence obtained from Williams through the Commonwealth's use of his prior statements was merely testimony relating generally to the events that occurred at the party. This testimony was cumulative of other testimony of the evening's events already given by Christina Johnson, Thomas Hardy, Matthew Green, and law enforcement officials. Williams' testimony simply restated prior facts testified to by other witnesses. Accordingly, after consideration of the record, we conclude that the admission of this evidence did not "'influence the jury' or had only a 'slight effect.'" Shifflett, 289 Va. at 12 (quoting Clay, 262 Va. at 260). Therefore, the error was harmless.

### III. CONCLUSION

We hold that the trial court did not abuse its discretion in refusing to admit evidence of third-party guilt. In addition, while the trial court erred in allowing the Commonwealth to

impeach its own witness, such error was harmless.  Consequently, we affirm the judgment of the trial court.

Affirmed.