COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Malveaux, Raphael and Frucci
Argued by videoconference


RONNIE MARSHALL

MEMORANDUM OPINION[*] BY
v.      Record No. 0890-23-4      JUDGE STUART A. RAPHAEL
AUGUST 20, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Stephen C. Shannon, Judge

Michael C. Sprano (The Sprano Law Firm, LLP, on brief), for
appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Ronnie Marshall appeals his convictions for aggravated murder and two counts of using a

firearm in the commission of murder. He argues that the trial court erred in denying his

attorney's motion to withdraw, admitting video recordings of the victims' interviews with police,

and excluding certain rap videos produced by the victims' son. Finding no abuse of discretion in

the trial court's rulings, we affirm the convictions.

BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the

prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard"

the defendant's evidence when it conflicts with the Commonwealth's evidence, "regard as true

all the credible evidence favorable to the Commonwealth," and read "all fair inferences" in the

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

Commonwealth's favor. *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

*Marshall breaks into the McDaniels' home*

The victims here were Brenda and Edward McDaniel, described to the jury as a "military couple."[1] In the early evening of May 24, 2021, Brenda and Edward were in their upstairs bedroom when their adult son Michael ran into the house and told them to call the police. Michael had been walking home from a grocery store when he saw one of his coworkers, Ronnie Marshall, in a car outside the residence. Michael took "cover" upstairs because Marshall had a gun.

Brenda and Edward heard loud banging on the front door, like someone was trying to get in. Edward got his shotgun and loaded it with two shells. As Brenda called the police, Marshall entered the home through the sliding back door. He was holding a gun and started to walk upstairs. Edward stood at the top of the stairs, unsure what was happening.

When he spotted Edward, Marshall asked, "Where's Michael?" Marshall claimed that Michael had taken something from him. Marshall held his gun to his side. As Marshall repeatedly asked about Michael, Brenda announced that she had called the police. With the sound of police sirens approaching, Marshall fled the house.

Fairfax County Police Officer Michael Schmeltz interviewed Brenda, Edward, and Michael. Schmeltz's body camera recorded the conversations, and those recordings were later admitted into evidence over Marshall's objection. Detective Jamaah Cheatham also interviewed the family. An audio recording of that interview was admitted into evidence, also over Marshall's objection.

---

[1] Brenda was a recently retired Army colonel who had served as a nurse; Edward was an active-duty Army colonel serving as a doctor. The trial court excluded evidence of their rank.

Later that evening, Michael's cellphone received a call from an unfamiliar number. Michael told the police about the call. The police determined that the number belonged to Marshall and that he had tried to call Michael three times on May 24th. Michael denied taking anything from Marshall and said that Marshall had been "picking on [him] at work."

*Marshall murders Brenda and Edward McDaniel*

On the morning of May 26, Brenda and Edward had a "talk about safety" with Michael, who was fearful after the break-in. Brenda and Edward then went outside to take the family dog on a morning walk. Michael and his girlfriend stayed in the house. Michael told his parents "to be careful."

That same morning, Marshall had finished his shift at FedEx, where he worked alongside D'Angelo Strand. Marshall was upset. He told Strand that "he had just been robbed" by a coworker. Marshall claimed to have been "jumped" and that the "father" had "pulled out" a "pump shotgun," stealing Marshall's firearm. Marshall asked Strand to drive him to the house so he could retrieve his property. Marshall offered to pay for "gas money."

Strand drove Marshall to the McDaniels' home, arriving around 9:00 a.m. Marshall told Strand to park "[a] little bit down the street around the corner." Marshall and Strand walked up to the house. Marshall told Strand that he had a gun with him.

Inside, Michael sensed something amiss and looked out from the dining-room window. He saw two men in hoodies approaching the house, and he recognized Marshall. Marshall was dressed all in black, wore gloves, and had a ski mask over his face. He also had a gun. Michael didn't recognize the other man, who was wearing all white. Michael called the police, locked all the doors, and ran upstairs with his girlfriend.

Looking out his bedroom window, Michael saw Marshall walking up from an exterior, basement-level staircase, then run down the driveway with the other man. Just then, the family

dog was returning home, off-leash, followed by Brenda and Edward. Marshall had "his hands out [of] his pocket[s]" and was holding the gun.

Marshall and Strand reached the bottom of the driveway as Brenda and Edward approached. Michael's parents were just outside of his view from the bedroom window. According to Strand, Marshall asked the parents, "Where's your son?" The parents said they didn't know. Marshall asked: "Am I going to get my money or my property back?" When one of the parents responded—"Does it look like I have a wallet?" Marshall leveled his gun at Edward and shot him. Edward fell back into the culvert at the edge of the yard.

Not expecting a shooting, Strand fled back to his car. As Strand ran, he heard "[a] few more shots." Michael too heard "multiple shots" as he and his girlfriend sheltered inside.

Strand got back into his car, Marshall jumped in on the passenger's side, and Strand drove away. Marshall asked Strand to drop him off in Alexandria. Marshall told Strand, "I had to do it because they knew my name."

Fairfax County Police Officers Dwayne Daniels and Brian Snow responded to Michael's call, finding two dead bodies on the ground, close to the street. Brenda was "just at the bottom of the driveway . . . partially under a tree"; Edward was in the ditch "between the mailbox and the driveway." Brenda had suffered a gunshot wound to the head and two to the torso. Edward had also been shot in the head and torso. The police found six .45 caliber cartridge cases nearby. Testing confirmed that the cartridges were discharged from the same gun.

Two witnesses in a pickup truck near the house saw a vehicle flee the scene; they reported the license plate number to the police. The next day, Strand turned himself in after learning that his "tags had been on the news" and that police were looking for him. Marshall was arrested soon after.

The grand jury indicted Marshall on two counts of aggravated murder (Code § 18.2-31), two counts of second-degree murder (Code § 18.2-32), and two counts of using a firearm in the commission of a murder (Code § 18.2-53.1). A jury trial was scheduled for October 24, 2022.

*Defense counsel moves to withdraw*

At his client's request, Marshall's court-appointed lawyer moved to withdraw. At a hearing on the motion, six days before trial, Marshall told the court that he didn't "feel like [his attorney] ha[d] [Marshall's] best interest [in] this case right now." Marshall said he wanted his attorney "to file a couple of motions," but the attorney said "he couldn't." Marshall interpreted that as "just a lack of effort." The court asked defense counsel if he "just ignore[d] [Marshall's] opinion" or if he "work[ed] through the legal issues when deciding which motions to file and which might be frivolous." Marshall's lawyer said that he didn't "believe there's any legal basis for" the motions Marshall wanted him to file.

The Assistant Commonwealth's Attorney informed the court that she had just learned of a jail call in which Marshall said that "he was planning to try and get his attorney removed from the case, and [that] if the Court denied that motion, his intention was to attack his attorney in a professional visiting booth." As the case was ready for trial, the Commonwealth opposed the motion to withdraw.

Marshall's counsel told the court that he was willing to remain on the case, but that "I think that does create a conflict if . . . I am given information that my client intended to . . . or intends to physically assault me. . . . I think that definitely creates a conflict of interest." The court took a recess for Marshall's lawyer to seek ethics guidance from the Virginia State Bar. Upon reconvening, the court asked defense counsel whether Marshall's threat would "prevent [him] from being a zealous advocate for [his client]." Marshall's lawyer said "no," he didn't take the threat "personally." He said that bar counsel had advised him simply to move to

withdraw and leave the decision to the court's discretion. Marshall's lawyer reaffirmed that the threat "would not affect [his] professional responsibilities and carrying out those responsibilities to zealously advocate on behalf of [his] client," but that it might be "sort of a distraction" at trial worrying "if [he] need[s] to duck."

For his part, Marshall denied having threatened his lawyer. He said that if the court listened to the recorded conversation, the judge would hear Marshall say, "Nah, I'm just playing. I would never do that."

The trial court listened to the recording, as Marshall had asked.[2] Afterward, the court found no cause to allow counsel to withdraw and denied the motion.

*The Commonwealth moves to admit Brenda's and Edward's recorded interviews*

The Commonwealth moved *in limine* to permit evidence of prior bad acts and "forfeiture by wrongdoing." It planned to introduce evidence that Marshall had been in the McDaniels' home two days before their murders, armed with a handgun, and had left only after Edward McDaniel confronted him with a shotgun. The Commonwealth moved to admit the parents' statements to police. Marshall did not contest the admissibility of the content of the parents' statements but opposed admitting them through video and audio recordings. Marshall argued that the statements should be elicited instead through the testimony of the police officers. He argued that the recordings would be unfairly prejudicial under Virginia Rule of Evidence 2:403(a) because of their "emotional impact," showing "two people two days before they were murdered." The trial court overruled Marshall's objections and the recordings were played for the jury.

---

[2] Because the recording was not admitted into evidence or transcribed at the hearing, it is not part of the record before us. At oral argument here, Marshall's counsel acknowledged the reasonable inference that the recording corroborated what Marshall claimed to have said on the recorded call.

*Marshall seeks to admit Michael's rap videos*

Michael, the victims' son, testified at trial. On cross-examination, Marshall sought to introduce portions of rap videos that Michael had made and posted online in the weeks before the murders. Marshall proffered that the videos were relevant to rebut the Commonwealth's theory of motive and to show that "there are potentially other people out there that also would not like [Michael] and would have motive to do him harm." Marshall added that the videos were admissible for impeachment because Michael had "denied engaging in any kind of taunting or insulting or challenging behavior to other people." Michael, however, had testified that his rap videos were not "smack talk" because they were not targeted "towards people . . . that's just rap."

The Commonwealth objected to admitting the videos, calling it "vague, irrelevant and confusing to the jury to say that a rap video would lead someone that is unnamed to commit a murder against two people when the witness has identified the perpetrator that he saw that day." The trial court watched the videos outside the presence of the jury. The court noted that one video mentioned "somebody named Jamal." The other videos did not "seem to be . . . tie[d] to any individual or incident that . . . might be offensive." The court said it would allow Marshall "to ask [Michael] questions about having a beef with someone named Jamal. But [the court] d[idn't] see a basis for the admissibility of the tapes at th[at] time."

When his cross-examination resumed, Michael denied knowing anyone named Jamal.

*Marshall is convicted*

The jury found Marshall guilty of one count of aggravated murder and two counts of using a firearm in the commission of murder.[3] The trial court sentenced Marshall to life

---

[3] The verdict form reflects that the jury found Marshall guilty of aggravated murder of more than one person as part of the same act or transaction. The jury did not return a verdict on the second aggravated-murder indictment that was premised on killing more than one person in

imprisonment for aggravated murder and eight years' incarceration on the firearms charges. Marshall noted a timely appeal.

ANALYSIS

Marshall seeks a new trial based on three rulings by the trial court that he says were erroneous. We consider each in turn.

*A. Motion to Withdraw (Assignment of Error 1)*

Marshall claims that the trial court should have permitted his lawyer to withdraw from representing him at trial. The decision whether to permit a court-appointed lawyer to withdraw is committed to the "sound discretion of the trial court." *Payne v. Commonwealth*, 233 Va. 460, 473 (1987). We review an order denying a motion to withdraw for an abuse of discretion. *Paris v. Commonwealth*, 9 Va. App. 454, 459 (1990).

Marshall argues that the trial court erred in denying the motion to withdraw because Marshall's threat to attack his lawyer created an "actual conflict of interest." The Sixth Amendment protects the right to assistance of counsel in criminal prosecutions, which includes the right to effective assistance of counsel. *Strickland v. Washington*, 446 U.S. 668, 686 (1984). "A defendant's right to counsel under the Sixth Amendment is violated by 'an actual conflict of interest [that] adversely affect[s] [a] lawyer's performance.'" *Kenner v. Commonwealth*, 71 Va. App. 279, 297 (2019) (first alteration in original) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)), *aff'd on other grounds*, 299 Va. 414 (2021). "The burden of establishing an alleged conflict of interest between an attorney and his client is upon the person who asserts such a conflict." *Turner v. Commonwealth*, 259 Va. 816, 819 (2000). So Marshall bears that burden here.

_____

three years. As Marshall was charged with aggravated murder and second-degree murder, the jury was instructed on more than one grade of homicide. Finding Marshall guilty of aggravated murder, the jury did not return a verdict on the second-degree-murder charges.

The burden to establish an actual conflict of interest is heavy. "'[A]n actual conflict of interest' mean[s] precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). "An actual conflict of interest exists where counsel has responsibilities to other clients or personal concerns that are actively in opposition to the best interests of the defendant." *Moore v. Hinkle*, 259 Va. 479, 489 (2000). "[T]he *possibility* of [a] conflict is insufficient to impugn a criminal conviction." *Kenner*, 71 Va. App. at 297 (first alteration in original) (emphasis added) (quoting *Cuyler*, 446 U.S. at 350). To meet his burden, Marshall must show "something beyond a mere theoretical concern that [his] attorney's performance *might* be affected by his knowledge of [Marshall's] threat." *Spence v. Commonwealth*, 60 Va. App. 355, 370 (2012).

Marshall failed to carry that burden here. Marshall asserts that "[t]he interest of [his] lawyer in his personal safety was clearly in conflict with [Marshall's] interest" because his counsel had "doubts regarding his ability to remain focused during the trial" since "at any given moment he might need to be ready to duck." Marshall Br. 11. But Marshall's lawyer twice told the trial court that Marshall's threat "would not affect [his] professional responsibilities . . . to zealously advocate" on Marshall's behalf. Indeed, Marshall has not alleged that his counsel was distracted at trial nor that his performance suffered in any way.

What is more, Marshall's claim of an actual conflict is undercut by Marshall's insistence at the hearing below that he would not physically harm his lawyer. Marshall told the trial court: "If you listen to the full phone call you would hear me say, 'Nah, I would never do that. I'm just playing.'" The trial court listened to the entire recording and still found no cause to allow counsel to withdraw. Having heard Marshall and listened to the recorded call, the trial court was entitled to credit Marshall's claim that he did not mean the threat.

Given counsel's unwavering position that he could still "zealously advocate" for Marshall and Marshall's insistence that he did not intend to threaten his lawyer, the trial court did not abuse its discretion in denying the motion to withdraw.

*B. The Recordings of Brenda's and Edward's Interviews (Assignment of Error 2)*

Marshall claims that the trial court abused its discretion by allowing the Commonwealth to play video and audio recordings of Brenda's and Edward's May 24, 2021 interviews with police. Marshall asserts that the probative value of the recordings was substantially outweighed by the danger of unfair prejudice because "[a]llowing the jury to see and hear the McDaniels tell that story themselves . . . served only to appeal to the emotions of the jury." We review a trial court's decision whether to admit evidence for an abuse of discretion. *Kenner*, 299 Va. at 424.

The Commonwealth has the "prerogative to choose what evidence to offer to the fact-finder to meet its burden of proof," subject only to the rules of evidence. *Boone v. Commonwealth*, 285 Va. 597, 600 (2013). Otherwise relevant evidence may be excluded if the probative value of the evidence is "substantially outweighed" by the danger of "unfair prejudice." Va. R. Evid. 2:403. "All evidence tending to prove guilt is prejudicial to an accused, but the mere fact that such evidence is powerful because it accurately depicts the gravity and atrociousness of the crime or the callous nature of the defendant does not thereby render it inadmissible." *Powell v. Commonwealth*, 267 Va. 107, 141 (2004). "'[U]nfair prejudice' refers to the tendency of some proof to inflame the passions of the [jury], or to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Lee v. Spoden*, 290 Va. 235, 251 (2015).

We have said that unfairly prejudicial evidence should be excluded when it "generates such a strong *emotional* response that it is unlikely that the jury could make a *rational* evaluation of its proper evidentiary weight." *Fields v. Commonwealth*, 73 Va. App. 652, 673 (2021).

Marshall asserts that seeing and hearing recordings of Brenda and Edward only two days before they were murdered would have a "powerful emotional effect on the jury."

But the trial court did not abuse its discretion in applying the balancing test required by Rule 2:403. Marshall concedes that the "content" of the parents' recorded interviews carried probative value. Assuming for argument's sake that some jurors would react emotionally to the parents' recorded interviews, the parents' calm demeanors in describing the encounter bely Marshall's claim that the recordings would "inflame the passions" of the jury. *See Lee*, 290 Va. at 251. The recorded interviews are nothing like the "particularly graphic crime scene or autopsy photos" that we said in *Fields* would be "*inherently* unfairly prejudicial." 73 Va. App. at 673. So we cannot say that the trial court abused its discretion in finding that the risk of unfair prejudice did not "substantially outweigh[]," Va. R. Evid. 2:403, the probative value of the evidence.

### C. The Rap Videos (Assignment of Error 3)

Finally, Marshall argues that the trial court should have admitted portions of rap videos that Michael made and posted on the internet before his parents were murdered. We review a trial court's decision to exclude such evidence for an abuse of discretion. *Kenner*, 299 Va. at 424.

Marshall says that the rap videos were relevant to show "that there might have been other people who also harbored ill will towards Michael McDaniel, and thus might have come to the house looking for him on May 26, putting them on a collision course with Brenda and Edward." Marshall adds that the videos were impeaching because Michael had testified that he did not engage in "taunting" or "smack talk" on social media.

Evidence that has "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence" is relevant evidence that is admissible,

subject to constitutional and statutory limitations and the Rules of the Supreme Court of Virginia. Va. R. Evid. 2:401. We have said that "evidence that merely suggests or insinuates that [a] third party may have committed the crime . . . 'is irrelevant; it tends to confuse and mislead a jury unless "evidence [has been] introduced . . . [that] points directly to guilt of a third party."'" *Ramsey v. Commonwealth*, 63 Va. App. 341, 354 (2014) (third, fourth, and fifth alterations in original) (quoting *Oliva v. Commonwealth*, 19 Va. App. 523, 527 (1995)). Such evidence is relevant "only 'where there is a trend of facts and circumstances tending clearly to point out some other person as the guilty party.'" *Oliva*, 19 Va. App. at 527 (quoting *Karnes v. Commonwealth*, 125 Va. 758, 766 (1919)).

The rap videos here contain offensive language and feature young men brandishing weapons. The videos do not call out specific individuals or make specific threats that suggest a motive to kill Michael or his parents. The trial court noted that only one video mentioned someone's name—"Jamal." The trial court allowed defense counsel to question Michael about a conflict with "Jamal." But Michael denied knowing anyone named Jamal or "calling out" Jamal in any rap video.

We find no abuse of discretion in the trial court's conclusion that the rap videos were not relevant to anything in controversy. Nonspecific and nontargeted "threats" in a rap video do not make it more probable than not that someone other than Marshall harbored sufficient ill will toward Michael to have come to his house on the morning of May 26, 2021, armed with a gun.

Nor can we find that the rap videos were admissible to impeach Michael's credibility. Marshall says that the videos "are full of vulgar, taunting, highly disrespectful, and threatening language" in "direct contradiction" to Michael's testimony that he did not engage in "taunting"

or "talking smack."[4] Marshall also claims that the videos impeached Michael's image as "an innocent young man who gets bullied by others but never responds in kind." To be sure, "[an] opposing party may impeach [a] witness by 'draw[ing] into question the accuracy of the witness's perception, recordation, recollection, narration, or sincerity.'" *McCarter v. Commonwealth*, 38 Va. App. 502, 506 (2002) (third alteration in original) (quoting Strong, *1 McCormick on Evidence*, § 33 n.5, at 123 (5th ed. 1999)). But a party may not introduce extrinsic evidence on a collateral matter to show that the witness testified untruthfully. *See* Va. R. Evid. 2:613(a)(ii) ("Extrinsic evidence of collateral statements is not admissible."). Whether Michael engaged in "taunting" or "smack talk" in his rap videos was collateral to whether Marshall was the assailant who murdered Michael's parents. The videos were thus properly excluded.

CONCLUSION

Finding no reversible error by the trial court, we see no basis to disturb Marshall's convictions.

*Affirmed.*

---

[4] For his part, Michael testified that his videos were not "smack talk" because they were not addressed "towards people . . . that's just rap." He said that his rap videos were "just for entertainment."

- 13 -